Teresa Anne PURICELLI, n/k/a Teresa Anne Jennewein, Petitioner/Respondent,

v.

Michael Thomas PURICELLI, Respondent/Appellant.

No. 73057.

Missouri Court of Appeals, Eastern District, Division Four.

June 9, 1998.

Bradley James Bakula, St. Louis, for Appellant.

Mary Ann Weems, Robert D. Beekman, Law Offices of Mary Ann Weems, Clayton, for Respondent.

SIMON, Judge.

Michael Thomas Puricelli, father, appeals from a judgment entered in the Circuit Court of St. Louis County which modified the Decree of Dissolution with his former wife Teresa Anne Jennewein, mother, allowing her to remove their daughter from the state of Missouri to the state of Texas. Father's point on appeal is directed solely to the removal of their child, Maria, to Texas and mother did not appeal the trial court's judgment as to the remainder of her motion seeking increased child support and modified temporary custody for father.

On appeal, father contends the trial court erred in allowing mother to remove the parties minor child to Texas from Missouri, to reside there on a permanent basis, thereby modifying the original decree of dissolution, arguing that: (1) moving to Texas was not in the best interests of the minor child; (2) moving to Texas will not improve the quality of the life of mother and child; (3) mother did not exhibit any need to remove their child to the state of Texas; (4) mother's motives in relocating were improper and made without considering the best interests of the child; (5) the move is unnecessary and only a matter of convenience; (6) father's motives for opposing the relocation are proper; and (7) father was not provided with a realistic opportunity for visitation to adequately preserve and foster a proper relationship between a father and his daughter. We reverse and remand.

The decision of the trial court will be affirmed unless it is unsupported by substantial evidence, it is against the weight of the evidence or it erroneously declares or applies the law. *Koenig v. Koenig*, 782 S.W.2d 86, 88 (Mo.App.1989).

The facts of this case are not in dispute. Father and mother were married on November 14, 1987. On March 7, 1989, their daughter, Maria, was born. On March 7, 1994, the parties entered into a separation agreement which provided in pertinent part:

2. The parties shall have joint legal custody of the minor child to wit: [Maria], born March 7, 1989. [Mother] shall have the primary care, custody and control of the minor child with [father] having temporary custody of the minor child per the attached schedule marked as "Exhibit A." During the time when the child attends school, [father] shall have temporary visitation as follows:

A. [Father] shall pick up the minor child after school on Monday, Tuesday and Thursday of every week;

B. [Father] shall have temporary visitation every other weekend from 4:00 P.M. on Friday to 6:00 P.M. on Sunday;

C. During the weeks in which [father] does not have weekend custody, [father] shall have temporary custody of the minor child from Tuesday after school until Wednesday morning when the minor child's school begins.

D. The parties shall submit any disputes as to any decisions to mediation by a catholic parish priest.

3. [Father] shall pay to [mother] the sum of $275.00 per month as and for child support during the months of May through October each year and $200.00 per month as and for child support, including school tuition and fees, day care, extra curricular activities and lessons during the months of November through April each year.

4. [Father] shall maintain health insurance coverage on the minor child. The parties agree to equally divide any and all uncovered medical expenses.

After mother and father had entered into the separation agreement, the Circuit Court of St. Louis County entered a decree of dissolution, dissolving their marriage and finding that the separation agreement was "not unconscionable, and that the terms thereof, providing for the custody, support and visitation of the child of the parties are in the best interest of said child." Further, the court ordered that "residence of said child shall not be changed from the state of Missouri, nor shall said child be removed from the state of Missouri for more than 90 days without the consent of the noncustodial parent." The separation agreement was made a part of the decree. We have reviewed the decree of dissolution including the separation agreement, but neither party could find a copy of Exhibit A to the separation agreement and it is not part of the record on appeal.

On April 11, 1997, father filed a motion to modify the decree of dissolution and alleged a change in circumstances. He asked the court to: (1) award custody of Maria to him; (2) terminate his child support obligations payable to mother; (3) order mother to pay to him child support in an amount which is fair and reasonable; (4) award mother reasonable times for visitation and temporary custody; and (5) order mother to pay his attorney's fees, costs and expenses incurred. In the second count of his motion, father asked for a declaratory judgment and injunction declaring any removal of Maria to the state of Texas by mother to be unjust and against the child's best interests; order that the primary physical care, custody and control of Maria be awarded to him; order mother to pay reasonable child support and terminate his obligation to pay child support; order mother to pay his attorney's fees; and enjoin mother from removing Maria from the state of Missouri.

In her answer and cross-motion to modify the decree, mother alleged in pertinent part:

3. Since the entry of said Decree, there has been a change in circumstances so substantial and continuing as to make the terms as to child support and child custody unreasonable, in that:

A. [Father] is employed and his earnings have increased substantially since the entry of the Decree of Dissolution;

B. The minor child is older and has greater expenses for her education and maintenance;

C. That due to the cost of inflation, the expense of maintaining and educating the minor child have increased;

D. The financial circumstances of the parties results in the change of child support from the existing amount by twenty percent (20%) or more;

E. [Mother] is engaged in businesses in which the majority of the clients and work is located in the state of Texas; [Mother] has the opportunity to increase her earnings substantially if she and the minor child can relocate to the state of Texas to pursue her business interests;

F. [Mother] is remarried and her husband is engaged in businesses in the state of Texas which require his being in the state for extended periods of time;

G. The minor child has friends and relatives in the state of Texas and has the opportunity to obtain excellent education and socialization with friends and relatives; and,

H. The minor child would have the opportunity to spend time with [father] equal to the time she has been in his temporary custody when living in the state of Missouri.

4. It is in the best interest of the minor child that [mother] be granted permission to remove the minor child to the state of Texas and to modify [father's] periods of temporary custody consistent with the minor child living in another state, and that the amount of child support to be paid by [father] to [mother] be increased with the Child Support Guidelines.

5. That [mother] lacks the resources with which to properly maintain this proceeding and to retain counsel and is, therefore, in need of assistance with her attorneys' fees.

WHEREFORE, [mother] prays for an order of the Court modifying the Decree of Dissolution of Marriage by granting Petitioner permission to remove the minor child to the State of Texas and to modify [father's] periods of temporary custody consistent with the minor child living in another state; that the amount of child support to be paid by [father] to [mother] be increased in accordance with the Child Support Guidelines, retroactive to the filing hereof; that [mother] be awarded her attorneys' fees and costs in connection with this Motion; and for such other Orders as the court deems just and proper.

Father filed an answer to mother's cross-motion to modify their decree of dissolution.

At trial, father testified in his own behalf and presented the testimony of his mother, Gerry Puricelli, and his fiance, Linda Venhaus. Further, father presented the following exhibits, which were included as part of the record on appeal: (A) Statement of Income and Expenses for mother filed on April 28, 1997; (B) Statement of Income and Expenses for mother filed December 1, 1993; (C) a list of Maria's relatives on her mother's side; (D) a list of Maria's relatives on her father's side; (E) Statement of Wages for father on May 16, 1997; and (F) a copy of Form 14 calculating father's child support obligation on August 20, 1997.

The record demonstrates that mother was employed with Executax, an accounting firm she owned with Greg Shockey, her new husband, who she knew for about a year and a half before she married him in December 1995. Mother would go to work after dropping Maria off at school around 8:00 A.M. and worked until she picked her up at school at 3:00 P.M.

At the time of her divorce from father, mother sold insurance and investments for Anthony Jennewein, her father, and her gross income was approximately $3,000 a month. Mother left the family business about six months after her divorce from father because she had an accounting degree and starting doing taxes, accounting work, etc. Before marrying Shockey, mother sold investments and insurance to approximately ten clients in Texas that she had met through him. She also had about fifty clients in Missouri and Illinois for whom she did ac-

counting work. When she married Shockey, mother began specializing in healthcare accounting for Executax. Mother's gross income as listed on her statement of income and expense was approximately $30,000 and she testified that her income had not decreased over the years.

Mother testified that she needed more income to support her daughter. Maria attends private school. Tuition for her to attend kindergarten was $1,500. For first grade it was $2,000 plus incidentals such as books, uniforms, etc. While in second grade, Maria's tuition went up approximately $20 a month. For third grade, Maria's tuition was $2,250 per year. Maria's gymnastics lessons cost $300 a month, which reflected an increase of $74 a month over the past two or three years. Maria also takes swimming and diving lessons which cost about $40 to $50 a month. Mother testified that her new husband makes about $50,000 a year and that their yearly gross income is about $80,000. Mother stated that she wanted to move to Texas because she couldn't afford Maria's extracurricular activities and they could better afford the lifestyle they were maintaining. Also, moving to Texas would give her steadier income. Mother stated that they went on a cruise to Mexico and spent $700 on a dog earlier in the year. Mother went to Texas four times a year on business and Shockey went once or twice a month. It costs between $160 to $450 for a round-trip airline ticket to Dallas.

Mother has one cousin, Tina Jennewein, living in Houston, Texas. Maria only sees this cousin on holidays when she comes to visit their relatives in St. Louis. Mother also wanted to move to a more family-oriented neighborhood in Texas because Maria has no friends in her neighborhood that she can play with. Mother admitted that Maria makes friends easily and has lots of friends in St. Louis from gymnastics class, Brownies, church, and diving. Mother testified that she has had one job interview in Texas and that she has been on one job interview in St. Louis in the past two years. Shockey has never interviewed for any jobs in St. Louis.

Mother still does investment and insurance sales, but she prefers accounting because it allows her to spend more time with her family. Mother has not done anything to supplement their family income except try to bring in more business for their accounting firm.

At the time of mother and father's divorce, mother's monthly expenses were $3,745. Her monthly expenses at the time of trial were $4,564, which she shared with her new husband. Mother drives an Infiniti J 30 and her husband drives a Ford Explorer. Although mother and Shockey had not found a house in Texas, mother enrolled Maria at Holy Trinity grade school in Texas.

Mother admitted that father would probably not be able to participate in Maria's school, sporting, or church activities if they moved to Texas. Mother stated that they would stay in St. Louis if the court did not allow them to move to Texas. All of Maria's grandparents and most of mother's family lives in St. Louis. Mother plans to fly to St. Louis with Maria and visit her family while Maria visits father.

Mother and Shockey filed a tax return stating that their adjusted gross income was $6,450 for 1996. Mother stated that the rest of their family income came in the form of loans from Executax. Approximately 95% of Executax's business comes from clients in Texas. Mother testified that she and Shockey had been offered jobs with Summit Therapies in Dallas, Texas. Mother would earn $30,000 a year, Shockey would earn $45,000 a year, and they could both still operate Executax.

In addition to providing his daughter's health insurance, father pays $200 a month in child support and deducts money from that amount when, at mother's direction, he purchases items for daughter. Mother stated that father took daughter on a five-day vacation the previous summer and gave up his weekend visitation periods with Maria so she could spend time with Shockey's children who were visiting their father in St. Louis. Mother stated that father dropped Maria off

at gymnastics practice on Fridays, attended a number of her gymnastics meets, attended her first communion, took her to church periodically, and attended at least one parent-teacher conference. Father coached daughter's softball team.

Father did not exercise his visitation rights during the week because he had to go to work at approximately 3:30 a.m. and moving Maria in the middle of the night would not be in her best interests. Father did not pick Maria up on Monday evenings because he and mother agreed that Monday would be "grandparent's day" and that Maria would spend the evening with her grandparents. When mother went to work for Executax, which is located near Maria's school, she and father agreed that it was in Maria's best interests that mother pick her up from school on the Tuesdays and Thursdays that father was supposed to have her.

Mother testified that moving to Texas would be in Maria's best interests and that she made several new friends there on her previous visits. Mother also stated that she kept father informed as to Maria's health and various activities, and that she would continue to do so.

Father testified that he attended all of the school meetings of which he had been notified by mother. He attends Maria's gymnastics practices regularly and has attended almost all of her diving meets and a majority of her soccer matches. He worked at the concession stand for her indoor soccer matches. Father pays for her health and dental insurance in addition to child support and spends money on her outside of his child support obligation to mother. Father has never been asked to pay for a portion of Maria's gymnastics classes. Father doesn't believe he and Maria would have the same relationship because he couldn't attend any of her activities that would occur during the week.

Father testified that he was marrying Linda Venhaus, a dental assistant, who is capable of caring for child when father has to get ready for work at 3:00 A.M. in the morning.

Gerry Puricelli, Maria's paternal grandmother, testified that Maria had ten first cousins on her father's side, many of whom are close to Maria's age, and that Maria has a good relationship with them. She lives in the same neighborhood as father and sees Maria several times a month.

Linda Venhaus testified that she was marrying father and that she had a daughter who was Maria's age. She testified that after they married they would live in her house, which is near father's current residence, that Maria and her daughter had become friends, and that they engaged in many family activities.

Mother presented the testimony of Greg Shockey and Tony Jennewein, her father. She filed the following exhibits admitted by the court: (1) a copy of her 1996 tax return; (2) a letter to her from Summit Therapies; (3) notes regarding Maria's visit to girl scout camp; (4) notes regarding Maria's first holy communion; and (5) her notes regarding Maria's activities.

Shockey testified that he had received a job offer in Dallas, Texas that would pay him $45,000 a year and allow him the time to operate their business. Shockey testified that they were a little behind on their bills. He testified that his personal expenses were $1,500 to $2,000 a month and that their expenses were about $6,000 a month. Shockey testified that it was possible to purchase roundtrip airline tickets from St. Louis to Houston for between $160 and $180 at specific times.

Anthony (Tony) Jennewein also testified on behalf of mother. He testified that they had a good relationship with Maria, they were financially able to visit Maria in Texas, and understood their reasons for moving to Texas.

On August 22, 1997 the trial court entered a judgment modifying the decree of dissolution. Father and mother retained joint legal custody of Maria, but mother was allowed to remain as Maria's primary custodian and remove her to the state of Texas. Father was awarded reasonable visitation rights to be

determined by the parties. The court further stated that:

In the event Mother and Father cannot agree on the time(s) Father shall have visitation and custody, Father's visitation and custody shall be as follows:

January— MARTIN LUTHER KING DAY weekend
From the time of the first flight to St. Louis available after school recesses the Friday before; [Maria] to be back in Texas by 8:00 p.m. on Monday.

February—PRESIDENT'S DAY weekend
From the time of the first flight to St. Louis available after school recesses the Friday before; [Maria] to be back in Texas by 8:00 p.m. on Monday.

March— The first six days of [Maria's] spring break

April— The second weekend in April
From the time of the first flight to St. Louis available after school recesses the Friday before; [Maria] to be back in Texas by 8:00 p.m. on Sunday.

May— MEMORIAL DAY weekend
From the time of the first flight to St. Louis available after school recesses the Friday before; [Maria] to be back in Texas by 8:00 p.m. on Monday.

June/July—SUMMER VACATION
The first Monday following the last day of school; [Maria] to be back in Texas by 8:00 p.m. on July 31.

Sept.— LABOR DAY weekend
From the time of the first flight to St. Louis available after school recesses the Friday before; [Maria] to be back in Texas by 8:00 p.m. on Monday.

Oct.— COLUMBUS DAY weekend
From the time of the first flight to St. Louis available after school recesses the Friday before; [Maria] to be back in Texas by 8:00 p.m. on Monday.

Nov.— THANKSGIVING
In odd-numbered years from the time of the first flight to St. Louis available after school recesses on Wednesday before Thanksgiving; [Maria] to be back in Texas by 8:00 p.m. on Sunday.
In even-numbered years, the weekend before Thanksgiving; from the time of the first flight to St. Louis available after school recesses on Friday; [Maria] to be back in Texas by 8:00 p.m. on Sunday. In the event that Veteran's Day is observed as a three day holiday weekend at [Maria's] school, Father may choose Veteran's Day weekend in lieu of the weekend before Thanksgiving, with Maria to be back in Texas by 8:00 p.m. on Monday.

Dec.— CHRISTMAS
December 25, from the time of the first flight to St. Louis available on Christmas morning; [Maria] to be back in Texas by 8:00 p.m. on Jan. 1.

If [Maria's] Spring Break takes place in April rather than March, Father shall have custody of [Maria] in April for the first six days of [Maria's] Spring Break; and also, during the second weekend of March, from the time of the first flight to St. Louis available after school recesses on Friday, with [Maria] to be back in Texas by 8:00 p.m. on Sunday.

It is the Court's intention that Father have liberal visitation with [Maria] during any trip Father takes to Texas to visit with [Maria].

The Court finds a change in circumstances so substantial and continuing as to make the terms of child support unreasonable. The Decree of Dissolution granted on March 7, 1994 is modified as follows: If medical, hospitalization and/or dental expenses of [Maria] are not covered by insurance, Mother and Father shall each pay 50% of the uncovered expense(s). The presumed correct child support amount as calculated by the Court pursuant to Section 452.340.8 RSMo, Supreme Court Rule 88.01 and Civil Procedure Form No. 14 is $666.00 per month with Father to pay mother $280.00 per month. The amount is rebutted as being unjust or inappropriate in that Father will pay sums greater than his share of the presumed amount of support and will incur significant transportation expenses for Maria, Mother expects a stable and increased income with her move

to Texas and there will be adequate provision for the needs of Maria. After consideration of all relevant factors, the Court finds that Father shall pay to Mother the sum of $110.00 per month child support for [Maria] beginning September 1, 1997....

All other orders in the Decree of Dissolution not herein modified shall remain in full force and effect.

■ Depositions shall not be taxed as costs. Costs assessed in favor of petitioner. In his only point on appeal directed to the removal of his child to Texas, father contends the trial court erred in allowing mother to remove Maria to Texas from Missouri, to reside there on a permanent basis, thereby modifying the original decree of dissolution, arguing that: (1) moving to Texas was not in the best interests of the minor child; (2) moving to Texas will not improve the quality of the life of mother and child; (3) mother did not exhibit any need to remove their child to the state of Texas; (4) mother's motives in relocating were improper and made without considering the best interests of the child; (5) the move is unnecessary and only a matter of convenience; (6) father's motives for opposing the relocation are proper; and (7) father was not provided with a realistic opportunity for visitation to adequately preserve and foster a proper relationship between a father and his daughter.

Section 452.377, RSMo 1994 (All future references will be to RSMo 1994 unless otherwise noted), provides in pertinent part:

"A person entitled to the custody of a child shall not change the residence of a child to another state or remove the child from this state for a period of time exceeding ninety days except upon order of the court or with the written consent of the parties with custody or visitation rights...."

■ In determining whether to grant the custodial parent's motion to remove a child from the state, the paramount concern is the best interest of the child. *Carter v. Schilb*, 877 S.W.2d 665, 667 (Mo.App.1994). When determining the child's best interest, courts are instructed to consider "[t]he needs of the child for a continuing relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child." *Koenig v. Koenig*, 782 S.W.2d at 90.

We have recognized four factors in determining the propriety of permitting the custodial parent to remove a child from the state: (1) whether the prospective advantages of the move will improve the general quality of life for the parent and the child; (2) the integrity of the custodial parent's motives in relocating; (3) the integrity of the noncustodial parent's motives for opposing the relocation, and the extent to which it is intended to secure a financial advantage with respect to continuing child support; and (4) the realistic opportunity for visitation which can provide an adequate basis for preserving and fostering the noncustodial parent's relationship with the child if relocation is permitted. *Carter*, 877 S.W.2d at 667–68. We will examine the facts of this case in light of each of these factors.

We first examine whether the prospective advantages of the move will improve the general quality of life for the parent and the child. Economically speaking, mother and Shockey will earn more money in Texas because they will both have jobs in addition to operating their business. Mother, who has been on one job interview in St. Louis in the last two years, and Shockey have not attempted to obtain other employment in St. Louis. Further, mother said that if the court ruled against her motion to remove, they would stay in Missouri.

While the evidence indicates that mother and Shockey would be earning more income on a regular basis and Maria would attend a private school comparable to the one she attends in St. Louis, there is no evidence that moving to Texas would be an improvement over mother and child's life if the family stayed in Missouri. Although mother and Shockey testified that they were a little behind on their bills and that 90% of Shockey's clients were from Texas, mother testified that if they stayed here in Missouri they would continue living in the style to which they had become accustomed. There is nothing to indicate the quality of their lives would be diminished by remaining here. *Carter*, 877 S.W.2d at 667. Furthermore, there was

no demonstration that their family's needs can not be met in Missouri. *Id.* The mere desire, verses the need to move is not sufficient. *Carter,* 877 S.W.2d at 667.

Although the amount of contact Maria has with her father and paternal grandparents was disputed, the record establishes that father has been an active participant in raising Maria and her remaining in St. Louis will allow her to continue to foster that relationship. Further, remaining in St. Louis will enable Maria to better maintain familial relationships with her grandparents, aunts, uncles and cousins, almost all of whom reside here. Although the proposed plan of custody would give father a significant amount of time with Maria, removing Maria to Texas would deprive her of maintaining the close relationship she has with her father and hinder father's ability to take an active role in his daughter's life. Further, Maria has many friends in St. Louis and mother has not shown that Maria has been adversely affected by not having any children in her neighborhood.

The second factor is the integrity of the custodial parent's motive in relocating. Mother's motive in moving to Texas is to earn more money so that she can better afford Maria's extracurricular activities and keep them in the lifestyle to which they've become accustomed. She has also expressed the desire to move to a neighborhood with children.

The record demonstrates that mother and Shockey would earn more money in Texas. It was undisputed that mother's and child's standard of living would not diminish in St. Louis. Further, the record establishes that mother and Shockey have not made attempts to obtain other employment in St. Louis. Mother has been on one job interview in St. Louis in the last two years and her only attempt at generating more family income was by attempting to recruit more business for Executax. Shockey has not attempted to obtain employment in Missouri.

The third factor to be considered is the integrity of the noncustodial parent's motives for opposing the relocation, and the extent to which it is intended to secure a financial advantage with respect to continuing child support. First, father pays $200 a month child support and provides Maria's health and dental insurance. Mother's relocation to Texas would actually reduce her need for father's child support payments and, although his transportation costs involving Maria would increase, his child support payments would decrease. The record establishes that father objected to mother's motion to remove Maria to Texas because he was concerned about their relationship and her relationship with the rest of her relatives, most of whom reside in St. Louis. Father has a close relationship with Maria and has been active in her life.

The fourth factor is the realistic opportunity for visitation which can provide an adequate basis for preserving and fostering noncustodial parent's relationship with the child if relocation is permitted. Father has participated in Maria's sports, school and religious activities on a regular basis, but would be unable to do so if she relocated to Texas. The visitation schedule is generous; however, many of the dates Maria would be required to travel are around holidays and the cheapest air fares at the most convenient times might not be available. Further, the travel will become burdensome as she becomes older and participates in more activities.

A review of the evidence, much of which is undisputed, shows that the trial court's conclusion that it was in Maria's best interest to move to Texas and to modify father's temporary custody and visitation rights lacked substantial evidentiary support. Mother did not appeal the trial court's judgment as to the remainder of her motion seeking increased child support, attorney fees and costs, and father's point is not directed to the denial of his motion. Therefore, we affirm in part, and reverse and remand with directions to the trial court for proceedings in accordance with this opinion.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

ROBERT G. DOWD, Jr., P.J., and HOFF, J., concur.