**Vicki Dawn FOHEY, Respondent,**

v.

**Kevin Lee KNICKERBOCKER, Appellant.**

No. ED 82779.

Missouri Court of Appeals, Eastern District, Division Three.

March 30, 2004.

Casey J. Welch, Hannibal, MO, for appellant.

Joseph A. Brannon, New London, MO, for respondent.

LAWRENCE E. MOONEY, Judge.

In this child relocation case, the father, Kevin Knickerbocker, appeals the trial court's judgment allowing the mother, Vicki Fohey, to relocate the divorced couple's minor daughter to Texas. The father alleges the trial court erred in allowing the relocation because the judgment was against the weight of the evidence and because there was no substantial evidence that the relocation was in the best interest of the child. Because we find the trial court's decision is unsupported by substantial evidence, we reverse.

*Factual and Procedural Background*

Myranda Lee Knickerbocker, born in 1998, is the only child of mother and father. Following her parents' divorce in April of 2000, Myranda lived with her mom, as mother had been awarded primary physical custody of Myranda, subject to the father's extensive visitation rights. Both mother and father continued to live in the Hannibal area after their divorce. In November of 2002, mother notified father that she wanted to relocate with Myranda to Fort Worth, Texas. Mother had been offered a job as a criminal investigator with Federal Protective Services. The father objected, and filed his motion seeking an order to prevent the relocation. A hearing was held on the parties' respective motions.[1]

At the time of the hearing, Myranda was five years old, and, by all accounts, a very happy and well-adjusted little girl. Most of the details regarding Myranda's life come from evidence presented by the father. As reflected by the evidence and by the court's findings, Myranda had a very strong bond with both her mother and father. The court found that both father and mother were excellent parents, and there is nothing in the record to indicate otherwise. Myranda also had very close relationships with her extended family. She also had a number of friends in town and at her daycare.

Myranda lived with her mother in a house in a good neighborhood and with a playground up the street. Myranda had lived in this house for most of her life. Although Myranda lived with her mother, she had frequent personal contact with her dad, as well as frequently talking with him on the telephone. Myranda saw her dad an average of nine out of every fourteen days. She spent every other weekend with her dad, from Friday afternoon until Tuesday morning. Myranda also stayed overnight with her dad on the alternate Mondays. Myranda would also see her father at least once a week when he came to her preschool to eat lunch with her. She would also see her father each week while she visited with her paternal grandparents.

The evidence shows that Myranda's father was actively involved in her life and upbringing. Father testified that when Myranda was with him he tried not to schedule any activities, other than those

---

1. Mother's motion seeking permission to relocate, and the father's motion objecting to the move were filed pursuant to Section 452.377

RSMo.2000. All further statutory references are to RSMo.2000.

activities he could do with Myranda. Myranda's father and step-mother engaged in educational activities with her, such as reading to her, working on her letters, spelling, and reviewing her school work. Myranda's father and step-mother had also established a positive behavior reinforcement system for Myranda, so that when Myranda did something well, she received a star or smiley face to put on her chart. Once she had earned enough stars or smiley faces, Myranda was rewarded with an activity, such as special day-trips. As the court found, Myranda's father had also been extremely active in her religious upbringing. During the weekends with her father, Myranda attended church with her dad and step-mother, who both taught Myranda's Sunday-school class. Myranda also sang with her step-mom as a part of Sunday school. Additionally, Myranda had been involved with her dad in his community activities, such as the Jaycee's glad-tidings project and bell ringing for the Salvation Army at Christmas. Myranda had also been involved in creating a float with her dad, and then riding the float during a parade.

By all accounts, Myranda had a good, affectionate relationship with her step-mother. Myranda did numerous activities with her, such as playing, arts and crafts, and educational activities such as working on her letters and the alphabet. Myranda's step-mother often read to her. Myranda's step-mother is an optometrist, and Myranda had accompanied her to work on a number of occasions, and had enjoyed playing her step-mother's assistant.

Myranda also had an excellent relationship with all of her grandparents, and visited with them each week. Her paternal grandparents picked Myranda up from preschool one day a week, and spent the afternoon with her. During these afternoon visits, Myranda's father would also come by for several hours to visit and spend time with Myranda.

At the time of the hearing, Myranda was in preschool and daycare at St. John's Lutheran Church. By all accounts, Myranda was doing very well in school. According to the preschool director, Myranda was a very-liked girl, was well-adjusted, doing well in her school work, and presented no behavioral problems while she was at school. Myranda's father came to eat lunch with Myranda at preschool once a week, and then would stay for playtime activities. According to the preschool director, Myranda's father was the most active parent at the school/daycare. Myranda often attended extracurricular activities at the school, such as Christmas programs, book fairs, and dinners. Myranda's father would also attend these activities with her, as would her mother. Myranda only attended preschool and daycare four days a week, for a total of about 30 hours. Myranda did not attend daycare on Fridays, as that was her mother's day off. On Fridays and at other times during the week, Myranda would spend the afternoon with her grandparents rather than staying in daycare. Myranda was scheduled to enter kindergarten in the fall of 2003, and would either continue at St. John's, or attend the public school just down the street from her house.

A good portion of the mother's testimony pertained to her new job. Mother testified that shortly before Myranda's birth, she gave up her career as a state highway patrol trooper. After separating from father, mother returned to school, graduating in May of 2002 with a bachelor's degree in administrative justice. At the time of the hearing, mother was employed as a security guard, working ten hours a day, four days per week, and making an annual salary of approximately $28,000 per year. Mother testified she did not want to con-

tinue on as a security guard, but rather, she preferred a job which was more of a career and had advancement opportunities. She testified that following graduation, she took the State of Missouri merit exam, and according to her, the positions she qualified for paid approximately six thousand dollars less per year than her current wage. Mother testified she could not afford such a pay cut. She also testified that she checked into other types of employment and that nothing had been offered. She did not specify what these other types of employment were. She also testified that because of her age, she was not eligible for any federal law enforcement jobs, except for the job in Texas.

As to the job in Texas, mother testified that she would be working five days a week, for ten hours each day. She would have weekends and holidays off, and be allowed comp-time if she needed to attend to Myranda. This job could involve travel, up to two hours away from the Fort Worth area, but there would be no overnight travel. She could, however, be called out of the area in the event of an emergency disaster. Though she had been offered the job, retaining the job was contingent on passing a security clearance, which could take several months to complete. And, sometime during the first year of her employment, mother would be required to attend a ten-week training course in Georgia. Mother anticipated that she would initially earn $10,000 to $12,000 more than her current rate of pay, and that if she received her security clearance and completed her training, the pay would increase to an annual salary of $50,000. After the first year, mother anticipated she would earn $60,000 per year. Benefits of this new job would include a retirement plan, health insurance, and on-site daycare services.

Mother believed that moving to Texas and advancing her career would benefit Myranda in several ways. Mother believed she would be financially able to allow Myranda to do things she wanted to do, that it would benefit Myranda's education, that they could live in a better home environment and afford to live in a better area. Mother testified that it was important for Myranda to see her mother trying to advance herself and better herself, that the job was something that she and Myranda could be proud of. Mother testified that taking this job would allow her to be a better person and therefore a better role model for Myranda.

At the time of the hearing mother did not know where she would be living in Fort Worth, other than probably in an apartment. Initially, Myranda would attend the on-site daycare facility at mother's place of employment. However, Mother did not know what daycare Myranda would be attending once Myranda started kindergarten in the fall of 2003. Nor did mother know where Myranda would be attending school. And, in part because she had made no living arrangements, Mother did not know the length of her commute each day. Mother had no family or friends in the Fort Worth area. Lastly, Mother agreed that some of the increase in salary would be taken up by higher living costs in the Fort Worth area.

After hearing the evidence, the court issued its findings of fact and conclusions of law, granting the mother's motion to relocate. The father now appeals.

## Discussion

Our review of this court-tried case granting a custodial parent's request to relocate the minor child's principle residence is governed by Rule 73.01, as construed by *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976); *Kell v. Kell,* 53

S.W.3d 203, 205 (Mo.App. E.D.2001). We will affirm the judgment unless there is no substantial evidence to support the trial court's decision, the decision is against the weight of the evidence, or the trial court's decision erroneously declares or applies the law. *Murphy,* 536 S.W.2d at 32; *Stowe v. Spence,* 41 S.W.3d 468, 469 (Mo. banc 2001); *Kell,* 53 S.W.3d at 205. On review, we view the evidence and any reasonable inferences drawn therefrom in the light most favorable to the prevailing party and disregard contradictory evidence. *Kell,* 53 S.W.3d at 205.

■ A party seeking to relocate with a minor child bears the burden of proving that the proposed move is made in good faith and is in the best interest of the child. Section 452.377.9; *Stowe,* 41 S.W.3d at 469; *Kell,* 53 S.W.3d at 206; *In re S.E.P. v. Petry,* 35 S.W.3d 862, 867 (Mo.App. W.D.2001). Disputes concerning the relocation of a child must be resolved on their particular facts. *Brethorst v. Brethorst,* 50 S.W.3d 864, 867 (Mo.App. E.D.2001). In determining whether to allow a parent to remove a child from the state, the paramount concern is the best interest of the child. *Id.* And, as the General Assembly has declared, it is the public policy of Missouri that frequent, continuing, and meaningful contact with both parents after the parents have dissolved their marriage is in the best interest of the child. Section 452.375.4.

In this case, the court found that the mother had acted in good faith in seeking the relocation. ·The father does not challenge this portion of the court's findings. What the father does challenge is the court's finding that it was in the best interest of Myranda to allow the mother to relocate to Fort Worth. In reaching its conclusion, the court found that, if mother relocated to Texas, she would have a substantial increase in her salary and that,

over a period of time, her standard of living would inure to Myranda in beneficial ways. The court also found that the father would have an opportunity for visitation of such a nature that it could provide frequent, continuing, and meaningful contact for the father. Finally, the court found that the relocation would improve the general quality of life for the mother and Myranda. Thus, the court found it was in the best interest of Myranda to allow the mother to relocate to Texas. The father argues the court's decision is against the weight of the evidence and that there is no substantial evidence to support the trial court's conclusion that the relocation was in Myranda's best interest.

■ The court's decision lacks substantial evidentiary support. Mother did present evidence that the job in Texas would be an advancement in her career and that she would receive an increase in her salary. What mother did not provide, however, is substantial evidence that the relocation was in Myranda's best interest. Mother did testify, in general terms, that she believed moving to Texas and advancing her career would benefit Myranda in several ways. She believed that she would be financially able to allow Myranda to do things she wanted to do, that it would benefit Myranda's education, and that they could live in a better home environment. Lastly, Mother also testified that it was important for Myranda to see her mother trying to advance herself and better herself, that the job was something that she and Myranda could be proud of. Mother testified that taking this job would allow her to be a better person and therefore a better role model for Myranda. We are mindful that, on review, we are to view the evidence in the light most favorable to the mother, as the prevailing party, and that we are to disregard contradictory evidence. Yet, we are charged with deter-

mining whether mother presented substantial evidence that relocation to Texas was in Myranda's best interest. We hold that this conclusory testimony does not provide substantial evidence that the relocation to Texas was in Myranda's best interest.

■ To begin, as the trial court found, mother presented no evidence of what Myranda's living environment would be like in Texas. "A good environment and stable home are primary considerations in determining a child's best interest." *Romanetto v. Weirich,* 48 S.W.3d 642, 646 (Mo.App. W.D.2001) *quoting Shaw v. Shaw,* 951 S.W.2d 746, 748 (Mo.App. W.D. 1997). The only time mother touched upon this subject is when she testified, in conclusory fashion, that she believed the relocation to Texas would benefit Myranda because her increased salary would enable her and Myranda to live in a better home environment. Mother, however, presented no evidence as to what their housing arrangements would be in Fort Worth, other than to say she and Myranda would probably live in an apartment. In addition to providing no evidence regarding Myranda's new home, mother also presented no evidence about Myranda's new neighborhood, nor what recreational opportunities would be available to Myranda in her new neighborhood. Mother explains that she was deferring such decisions until she had received court approval to relocate. While we can appreciate her position, it was mother's burden to show that the move was in Myranda's best interest. And thus, it would have behooved mother to provide the trial court with some evidence as to Myranda's proposed living environment. *See Wilson v. Wilson,* 873 S.W.2d 667, 670 (Mo.App. E.D.1994) (providing no plan for living arrangements that would provide a stable environment for child is sufficient to support the denial of parent's request to

relocate.); *Koenig v. Koenig,* 782 S.W.2d 86, 90 (Mo.App. E.D.1989)(upholding denial of request to locate based in part on scarcity of testimony about new living arrangements); *Samuels v. Samuels,* 713 S.W.2d 865, 869–70 (Mo.App. W.D.1986)(upholding denial of request to locate, noting that plans for living arrangements and employment were too speculative); *Thomas v. Thomas,* 989 S.W.2d 629, 633–4 (Mo.App. W.D.1999)(finding evidence supported decision that relocation was in child's best interest, noting evidence was presented of neighborhood, school, and recreational opportunities at new location); *Romanetto,* 48 S.W.3d at 646(finding evidence supported trial court's conclusion that relocation was in child's best interest, noting evidence presented of child's new home, neighborhood and city); *In re Marriage of Cornish,* 780 S.W.2d 62, 64 (Mo.App. E.D.1989)(finding evidence supported trial court's conclusion that relocation was in children's best interest, noting detailed testimony presented regarding proposed living environment of the children); *see also In re S.E.P.,* 35 S.W.3d at 867; *Spire v. Adwell,* 36 S.W.3d 28, 32 (Mo.App. W.D. 2000).

Mother also testified, in conclusory fashion, that the relocation to Texas would benefit Myranda because the increased earnings would benefit Myranda's education. Again, mother provided no other details. For instance, Myranda was in private school in Hannibal, but mother presented no evidence on whether she planned to keep Myranda in private schools. And although it was unsettled where Myranda would be attending kindergarten if she remained in Hannibal, she would either be continuing at St. John's or attending the public school in her neighborhood. Mother did not know where Myranda would be attending school in Texas, public school or otherwise. *Compare In re*

*S.E.P.,* 35 S.W.3d at 867 (noting evidence presented that children would be attending high quality schools weighed in favor of allowing relocation); *Spire,* 36 S.W.3d at 32 (finding evidence supported decision that relocation was in children's best interest, noting mother presented evidence regarding the quality of the children's new school district); *Thomas,* 989 S.W.2d at 633 (same). Further, in contrast to the father's testimony that he had already started to save for Myranda's college education, mother presented no evidence on whether she planned to use any of her increased earnings to do likewise. Mother also testified, again in conclusory fashion, that she would be financially able to allow Myranda to do things she wanted to do—but provided no details as to what this might entail. For instance, she provided no indication of what activities and opportunities would be available to Myranda as a result of the move that were not available to her in Hannibal. Nor did mother provide any evidence demonstrating that she was currently unable to meet Myranda's needs. *See Puricelli v. Puricelli,* 969 S.W.2d 289, 296-7 (Mo.App. E.D.1998)(finding evidence did not support finding that relocation was in child's best interest, noting there was no evidence that moving would be an improvement over child's life in Missouri, and that there was no demonstration that family's needs could not be met in Missouri); *see also, Carter v. Schilb,* 877 S.W.2d 665, 667 (Mo.App. W.D. 1994).

██ It is clear from the cases that in a highly mobile society, it is unrealistic to inflexibly confine a custodial parent to a fixed geographical area, if removal to another area for reasons such a change of employment is consistent with the best interests of the child. *See, e.g., In re Cornish,* 780 S.W.2d at 65. And, we recognize that judicial permission to remove the child from the state is warranted where the custodial parent demonstrates a need to move from the state in order to achieve employment and financial betterment which will subserve the best interest of the child. *See, e.g., Butler v. Butler,* 922 S.W.2d 18, 19 (Mo.App. E.D.1996) *quoting Michel v. Michel,* 834 S.W.2d 773, 778 (Mo.App. S.D.1992). However, the relocation must be shown to be in the best interest of the child. Here, in concluding that the relocation would be in Myranda's best interest, the trial court found that mother would be getting a substantial increase in salary, and that over a period of time mom's standard of living would inure to Myranda in beneficial ways. The trial court may have inferred that an increase in the mother's salary would result in an increased standard of living for the mother, and then further inferred that this would benefit Myranda. However, there was no substantial evidence upon which to base these multiple inferences. Mother provided no particular evidence of how she would use her increased salary to either her or Myranda's benefit. And, in spite of the evidence that she would receive an increased salary, and in spite of her claims that her increased earnings would benefit Myranda, mother did acknowledge that some of the increase in her salary would be taken up by the increased cost of living in Fort Worth. It is unclear just how much increase in salary the mother would realize after adjustment for this increased cost of living.

To support her argument that there was substantial evidence to show that the relocation was in Myranda's best interest, the mother relies on the case of *Abernathy v. Meier,* 45 S.W.3d 917 (Mo.App. E.D.2001). In finding that there was sufficient evidence that relocation was in the child's best interest in that case, this Court noted that direct evidence of a parent's new employment can be indirect evidence of a

child's best interest. We also noted in that case that a parent's increased salary and potential for advancement have a direct impact on a child's standard of living. Mother argues such is the case here. However, in that case, there was also evidence that the parent's new job would provide significantly cheaper health insurance. There is no such evidence here. Further, in *Abernathy*, the new benefits directly related to the employee's child, such as scholarships for an employee's child, and recreational opportunities in the form of a YMCA membership. There is no comparable evidence here. Mother did not know the particulars of the federal benefits, other than they would include a pension plan, on-site daycare facilities, and health insurance, which she currently did have through her present employment. Furthermore, in finding that there was sufficient evidence that relocation was in the child's best interest in *Abernathy*, we considered the fact that the father in that case had never lived with the mother and child, and that the father's relationship with child had at times been strained. That is in direct contrast to evidence in this case, where there is an actively involved father, with whom Myranda has an excellent relationship.

The uncontroverted evidence in this case demonstrates that father was actively involved in Myranda's life. Myranda had personal contact with her father on an average of nine out of every fourteen days. In addition to the regularly scheduled visitation, father visited with Myranda at her grandparent's house each week, and ate lunch with her at her preschool once a week. Father participated in Myranda's school activities, spent time working with Myranda on her reading and schoolwork, routinely took Myranda to church, and involved Myranda in his community activities. Father would be unable to do these things if Myranda relocated to Texas. As

even mother acknowledged, Myranda would not have her father around to provide guidance or be involved in her day-to-day activities if she relocated to Texas.

Despite this evidence, the court found that the father would have an opportunity for visitation of such a nature that it could provide frequent, continuing, and meaningful contact for the father. The court's visitation schedule provides that father has nine weeks of summer visitation with Myranda. Father has custody and visitation with Myranda on every three-day weekend during the school year. He may also have visitation for two weekends a month, to be exercised in the Forth Worth area. Father also has visitation-custody with Myranda for several days every Christmas vacation, as well as spring breaks. He also has visitation over the Thanksgiving and Labor Day holidays in odd years, and Memorial Day in even years. The court also allowed for liberal, but reasonable, phone access to Myranda. Mother also testified that father was welcome to come to Texas to spend time with Myranda in addition to those times provided in the visitation schedule.

While this visitation schedule appears generous, there are questions as to its feasibility and practicality, as well as the realistic amount of time father would be able to spend with Myranda during these scheduled visitations. To begin, father only accrues twelve hours of vacation time per month, or about three and one-half weeks per year. He testified he would use the majority of this time for summer vacation. Many of the proposed visitations are to take place in Fort Worth. As father testified, it is a twelve-hour drive from Hannibal to Fort Worth. A good portion of the time allotted for his visitation with Myranda would be taken up in travel time, meaning less time Myranda would get to spend with her father. Father could fly to

Fort Worth, and although he testified he would make every effort to exercise his visitation rights, he also testified the travel expenses would be a burden to him. Many of the scheduled visitations are around holidays and vacation times, when airfares are typically more expensive. Further, Myranda would be required to travel back and forth from Texas to Missouri at a tender age. Also, as alluded to in mother's testimony, it is reasonable to infer that travel back and forth from Texas to Missouri would become more burdensome as Myranda becomes older and participates in more activities. See *Puricelli*, 969 S.W.2d at 297 (finding evidence did not support finding that relocation was in child's best interest, noting burdensome travel); *Carter*, 877 S.W.2d at 668 (finding evidence supported denial of relocation, noting amount of travel time made visitation schedule less feasible); *Wild v. Holmes*, 869 S.W.2d 917, 919 (Mo.App. E.D.1994)(overruled on other grounds)(affirming denial of permission to relocate, noting proposed move was a nine-hour drive).

■ We recognize that frequent, continuing, and meaningful contact is not limited to physical contact and can include telephone calls or other communication. *See In re S.E.P.*, 35 S.W.3d at 869; *Boling v. Dixon*, 29 S.W.3d 385, 388 (Mo.App. W.D.2000). And, we are also mindful that a trial court may properly permit removal of a child even where removal will make visitation more difficult for the noncustodial parent. *See, e.g., In re Marriage of Cornish*, 780 S.W.2d at 65. But the removal of a child from the state must be in the child's best interest. It is the declared public policy of this state that it is in the best interest of a child to have frequent, continuing, and meaningful contact with both parents after the parents have dissolved their marriage. Section 452.375.4;

*Tucker v. Tucker*, 778 S.W.2d 309, 312 (Mo.App. W.D.1989)(best interests of a child are best served by continued interrelationships with both parents). From the evidence presented in this case, removing Myranda to Texas would necessarily deprive Myranda of the frequent and consistent contact that she enjoyed with her father. The decrease in frequency of personal contact between Myranda and her father, and the additional burdens of travel associated with the distance do not support the court's findings that relocation is in Myranda's best interest. *See Puricelli*, 969 S.W.2d at 297 (finding evidence did not support finding that relocation in child's best interest evidence, noting that although proposed custody plan gave father a significant amount of time with child, removing child would deprive her of maintaining the close relationship she had with her father and hinder father's ability to take an active role in daughter's life); *Brethorst*, 50 S.W.3d at 868 (finding substantial evidence that relocation not in children's best interest where relocation would interrupt children's frequent and consistent contact with their actively involved father); *see also, O'Leary v. Stevenson*, 782 S.W.2d 109, 111–2 (Mo.App. W.D. 1989); *In re S.E.P.*, 35 S.W.3d at 869; *Tucker*, 778 S.W.2d at 312 (noting it can be a decisive factor where the effect of the move will be to deprive the child of desirable contact with the noncustodial parent).

Removing Myranda to Texas would also significantly decrease her contact with other members of her family. In Hannibal, Myranda saw both sets of grandparents once a week, and had done so since birth. While her maternal grandparents said they could easily travel to Texas, her paternal grandparents would be unable to make any such trips. Moving to Texas would also decrease Myranda's contact and interaction with her step-mother. It is uncontroverted that Myranda had an ex-

cellent relationship with her step-mother. Myranda's step-mother is very active in her life, and, as admitted by Myranda's mother, a good role model for Myranda. In all, if relocated to Texas, Myranda would be going from an environment where she was surrounded by an extended family who were all very active in her life, to an environment where there would be no family. The decreased contact and interaction Myranda would have with the members of her extended family does not support the court's conclusion that relocation was in her best interest. *See Wild,* 869 S.W.2d at 919 (overruled on other grounds)(in denying permission to relocate, trial court noted the child's grandparents and other close relatives all lived in Missouri, and there were no relatives of child in new location); *Puricelli,* 969 S.W.2d at 297 (finding evidence did not support finding that relocation in child's best interest evidence, noting remaining in Missouri would enable child to better maintain relationships with grandparents and other family members who resided in Missouri); *Compare Michel v. Michel,* 834 S.W.2d 773, 775 (Mo.App. S.D.1992)(overruled on other grounds)(in allowing relocation court considered fact that maternal grandparents were available to provide support in new location).

In concluding that it would be in Myranda's best interest to allow mother to relocate to Texas, the trial court found that the relocation would improve the general quality of life for the mother and Myranda. In Hannibal, Myranda lived in a house, in a good neighborhood, and had a playground up the street. She was surrounded by a loving and involved extended family. At the time of the hearing, Myranda was enrolled in private school, and doing well in school. Myranda was also involved in church and community activities. As to Myranda's life in Texas, the court was presented with no evidence regarding My-

randa's living environment, no evidence regarding what school Myranda would be attending, no evidence regarding daycare arrangements once Myranda started school, and no evidence of opportunities available to Myranda in Texas that were not available to her in Missouri. There was no evidence that Myranda's needs were not being met in Missouri. There was no particular evidence on how mother would use any increased earnings to benefit Myranda. There was no evidence that Myranda's religious education and upbringing would continue. As mother herself testified, she did not regularly attend church with Myranda. Relocating to Texas would deprive Myranda of the frequent and consistent contact that she enjoyed with her father and other members of her extended family. Further, from the evidence presented, it is reasonable to infer that Myranda would be spending more time in school and daycare facilities than she had in Hannibal, even taking into account that she would be starting kindergarten. At the time of the hearing, because she was able to spend one day with her mother and other times with her extended family, Myranda only spent four days, or about 30 hours a week in preschool and daycare. Mother's new job would require her to work five days a week, for ten hours a day. This is ten hours more a week than she worked in Hannibal. And, in contrast to Hannibal, there would be no family members present in Texas to care for Myranda instead of her attending daycare. Based on this, we cannot say the evidence shows that moving to Texas would be an improvement over Myranda's life in Missouri. *See Puricelli,* 969 S.W.2d at 296–7.

Concluding, the trial court was in the unenviable position in this case of having to choose between the mother's need and desire to relocate, and Myranda's consis-

tent contact with her father and other family members. The court chose to allow the relocation. There is no doubt that the relocation was in the mother's best interest. What is unsubstantiated, based on the evidence presented, is whether the relocation is in the Myranda's best interest. It might be in the mother's best interest to relocate, but that is not the standard which governs. *O'Leary*, 782 S.W.2d at 112. It was the mother's burden to prove the relocation was in the best interest of the child. The trial court found that the mother had carried her burden and that it was in Myranda's best interest to move to Texas. We find the court's decision lacks substantial evidentiary support. By our decision today, we in no way impugn the mother's laudable efforts to improve her lot in life. The focus of our inquiry is simply the sufficiency of the evidence that the relocation is in Myranda's best interest. Because the trial court's decision is unsupported by substantial evidence, the court's judgment is reversed.[2]

CLIFFORD H. AHRENS, P.J., and WILLIAM H. CRANDALL, JR., concur.

---

2. Having reversed, we need not address the father's remaining point on appeal regarding the court's allocation of transportation costs and health insurance for Myranda.