Tanya WIGHTMAN, k/n/a Tanya Giovanni, Appellant,

v.

Michael WIGHTMAN, Respondent.

### No. ED 91738.

Missouri Court of Appeals, Eastern District, Division Five.

Sept. 22, 2009.

(2000).

Rufus James Tate, Jr., St. Louis, MO, for Appellant.

Christopher M. Braeske, St. Louis, MO, for Respondent.

ROY L. RICHTER, Judge.

Tanya Wightman Giovanni ("Mother") appeals the trial court's judgment granting Michael Wightman's ("Father") motion to prevent relocation as well as his motion to modify child support, and ordering Mother to pay the majority of the guardian ad litem fees. Mother also appeals the trial court's judgment ordering her to pay Father's attorney's fees on appeal. We reverse and remand for further proceedings.

## I. BACKGROUND

Father and Mother's marriage was dissolved in 2005. There were two children born of the marriage, a boy in November 2002 and a girl in March 2004 ("the children"). The judgment of dissolution granted Mother sole legal and physical custody of the children subject to Father's visitation and ordered Father to pay Mother $812 per month in child support. Father's regular visitation included every other weekend from Saturday to Sunday and Wednesday evenings from 4:30 p.m. until 7:00 p.m. Both Mother and Father lived in St. Louis at the time of dissolution.

Father filed a motion to modify child support in July 2007.[1] His motion alleged that that he was currently making substantially less than he was at the date of dissolution and that Mother's income had increased.

One month later, August 2007, Mother notified Father via letter that she intended to relocate to North Carolina with the children and her husband, Dwight Giovanni ("Stepfather"). Mother stated she needed to move because her income in St. Louis was being reduced and because Stepfather had better job opportunities in North Carolina. Father filed a timely motion to prevent relocation and an accompanying affidavit which alleged that Mother's relocation should be prohibited because: (1) her reason for relocation—a decrease in income—was speculative and unfounded; and (2) relocation would prevent Fa-

---

1. Father has been perpetually behind in his child support payments and has been prosecuted twice for criminal non-support. He was still in arrears at the time of trial, though the parties disputed the exact amount. Father claims that he was only one month, or $800 behind, while Mother claimed Father still owes her $5,000 in back child support. Neither party included evidence on this issue in the record on appeal.

ther from having frequent and meaningful contact with the children.

In February 2008, a trial was held on Father's motions to prevent relocation and to modify child support. Following the trial the court entered judgment prohibiting the children from relocating to North Carolina with Mother. The court sustained Father's motion to modify child support and reduced his support obligation from $812 to $442 per month. Finally, the court assessed $1,974 of the additional GAL fees to Mother (70%) and $846 to Father (30%). After a short hearing in October 2008, the court granted Father's motion for attorney's fees on appeal, and ordered Mother to pay Father $15,000 for his appellate legal fees. Mother appeals.

## II.  DISCUSSION

■  Our review of a court-tried case is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *Fohey v. Knickerbocker*, 130 S.W.3d 730, 733 (Mo. App. E.D.2004). We will affirm the judgment unless there is no substantial evidence to support the trial court's decision, the decision is against the weight of the evidence, or the trial court's decision erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32; *Fohey*, 130 S.W.3d at 734. We view the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict and we disregard all contrary evidence. *Fohey*, 130 S.W.3d at 734.

■  In her first point on appeal, Mother argues that the trial court erred in finding that it was not in the children's best interests to relocate to North Carolina. She asserts that the trial court's judgment is against the weight of the evidence and is not supported by substantial evidence. We agree.

■  The party seeking to relocate shall have the burden of proving that the proposed relocation is made in good faith and is in the best interests of the child. Section 452.377.9 RSMo 2000[2]; *Fohey*, 130 S.W.3d at 734. In making its best interests determination, the trial court looks to the factors enumerated in section 452.375.2. Disputes concerning the relocation of a child must be resolved on their particular facts. *Fohey*, 130 S.W.3d at 734.

In reaching its decision the trial court found that Mother had made her request in good faith but that relocation would not serve the children's best interests. The court did not believe that the children would benefit economically, educationally, or socially from the move, and found that Mother "has no reason to move besides a desire to move."

With regards to finances, the trial court found no evidence aside from Mother's testimony to indicate that she experienced a decrease in income in St. Louis. Mother is a personal injury attorney and the court believed she could earn a better living as an attorney in Missouri or Illinois where she has contacts rather than in North Carolina where she has none. The trial court stated that Stepfather would earn only $684 more per year working at the North Carolina Kinko's store than he would at the St. Louis location, and felt that the additional income would not substantially improve the family's financial situation.

■  First, we note that a parent is not required to show that relocating will prove economically beneficial to the child. *Ratteree v. Will*, 258 S.W.3d 864, 870 (Mo.App. E.D.2008) (stating that "[w]hile economic benefit can be a factor weighing in favor of relocation, a parent is not required to show

**2.**  All statutory references are to RSMo 2000  unless otherwise noted.

it in order to be permitted to relocate"). Even so, the trial court's findings on this issue are against the weight of the evidence. Mother testified that she had been unable to find a full-time attorney position in Missouri. She stated that in the fall of 2006 her employer, Alif Williams ("Mr. Williams"), told her that he could no longer afford to pay her a salary. As of the trial date, Mr. Williams had begun paying Mother on an hourly basis, $32 per hour, for individual jobs only when he needed her. While Mother's search for other attorney positions in the St. Louis area had proved unfruitful, she had interviewed twice with a personal injury attorney in North Carolina. Thus, Mother's testimony indicated that, at the time of trial, she actually had more promising job prospects in North Carolina than in Missouri.

The trial court's finding that Stepfather's income would increase by only $684 per year at the Raleigh, North Carolina Kinko's is only partially correct. Mother testified that Stepfather's starting salary at the Raleigh Kinko's would roughly equal what he had earned in St. Louis. However, the Raleigh store presented promotion opportunities that the St. Louis store did not. Mother further testified that Stepfather had been assured he would move up the pay scale quickly in Raleigh and soon be earning much more than he had in St. Louis. Thus, even though Mother was not required to prove that the children would economically benefit from the move to North Carolina, the trial court's finding to the contrary was against the weight of the evidence.

The trial court then found that it served the children's best interests to remain in St. Louis in close proximity to their extended family. The trial court attached little or no weight to the fact that Mother has several relatives living within one hour of Raleigh and it stated that the children

have had little contact with them over the years. The court emphasized the fact that Mother's two brothers, sister-in-law, and their children live in the St. Louis area, as do Father's parents, brother, and sister. The court found that the children have a good relationship with these St. Louis relatives.

■ The fact that the children will miss out on time with their extended family in St. Louis does not make the North Carolina move against their best interests. *See Ratteree*, 258 S.W.3d at 870 (stating that "it was not against the weight of the evidence for the trial court to find that despite the deprivation of Grant's time with his Father and extended family in St. Louis, it was in Grant's best interests to relocate"). Furthermore, our courts recognize that, in today's highly mobile society, it is unrealistic to confine a parent to one geographic location. *Id.*

In addition to Mother's grandmother, uncle and cousins, all of whom live within one hour of Raleigh, Mother's mother plans to move to North Carolina with the family and help with the children. Furthermore, Mother testified that the children have a very good relationship with Stepfather and that the four of them do things together as a family. While the children may miss time with their Father and extended family in St. Louis, the fact that they will maintain close relationships with the family unit favors relocation. This situation is similar to *Dorman v. Dorman*, 91 S.W.3d 167 (Mo.App. W.D.2002), wherein the court found that the child's relationship and interaction with "those persons who may *significantly* affect his best interests, namely his stepfather and half-sister, weighs in favor of relocation." *Id.* at 173.

The trial court then found that Father would be shut out of the children's lives if they were to move to North Carolina be-

cause visits would not take place. The court apparently believed that Mother would prevent Father from visiting with the children because it noted elsewhere in its judgment that Father had consistently exercised his visitation though Mother had occasionally kept the children from him. This finding is not supported by substantial evidence.

Father did testify that Mother had kept the children from him approximately twelve times during the two years since the dissolution. Mother, however, presented evidence that Father had failed to exercise his visitation rights twenty-one times, and that on one occasion he voluntarily went twenty-seven days without seeing the children. Mother testified that she has only denied Father visits because the children were either sick or on vacation, and that Father knew of those circumstances in advance. Mother further stated that she has gone out of her way to include Father in the children's lives, including offering him extra visitation on Fridays and inviting him to events such as doctor's appointments, zoo visits, and birthday parties.

Furthermore, Mother presented a detailed and workable visitation plan that would allow Father frequent and meaningful contact with the children. Mother plans to enroll the children in a year-round track program in North Carolina, which combines nine weeks of school with a three week break called a "track out" period. Mother proposes that Father have the children the first week of every track out period, and the entire three weeks for two of the four track out periods. Mother states that her mother will accompany the children on the flight to and from Raleigh, and that Mother and Father will each pay half of the children's airfare, or, $150 each.

Most importantly, Mother has been and remains the children's primary custodian and caregiver; the three have not been separated for more than three days since the dissolution. In addition to their bond with Mother, the evidence at trial also indicated that the children have developed a good relationship with Stepfather. The record reveals that Father's visitation, in contrast, has been sporadic. Moreover, his current arrearage aside, Father has always been behind in his child support payments and has twice been prosecuted for non-support. He was also convicted of filing a false report after he accused Stepfather of molesting one of the children. Finally, Mother has researched the Raleigh, North Carolina area and she presented substantial evidence concerning her and Stepfather's employment there in addition to the children's educational and recreational opportunities. Thus, we believe the children's best interests are served by remaining in Mother's primary care.

For the reasons discussed above, the trial court's judgment wherein it found the children's relocating to North Carolina with Mother to be against their best interests was against the weight of the evidence and not supported by substantial evidence. Mother's first point is granted.

In her second point on appeal, Mother argues that the trial court erred in granting Father's motion to modify child support. We agree.

■ We will not disturb an order modifying a child support obligation unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Wallace v. Wallace*, 269 S.W.3d 469, 477 (Mo.App. E.D.2008) (citing *Forde v. Forde*, 190 S.W.3d 521, 527 (Mo.App. E.D. 2006)).

■ The trial court reduced Father's child support obligation from $812 per

month to $442. In so doing, the court rejected the parties' proposed Form 14s and calculated its own. Mother challenges multiple aspects of the trial court's Form 14 calculations. She first argues that the trial court erred in imputing $78,000 of annual income to her because that amount presumes that she will be working as an attorney in Missouri, when she will actually be working as an unlicensed attorney in North Carolina.

■■■■ "Where one of the parties is not employed or is underemployed, the trial court may attribute income to that party in the context of a Form No. 14 calculation depending on the factual circumstances." *Monnig v. Monnig*, 53 S.W.3d 241, 245 (Mo.App. W.D.2001) (quoting *Jones v. Jones*, 958 S.W.2d 607, 611 (Mo.App. W.D. 1998)). Courts are allowed to impute income to a parent in order to prevent the parent from escaping responsibilities to the family by deliberately or voluntarily reducing income. *Buchholz v. Buchholz*, 166 S.W.3d 146, 152 (Mo.App. S.D.2005). Imputing income is determined on a case by case basis, but is proper where a parent voluntarily reduces income without justification. *Id.* at 153. It can also be proper where a parent involuntarily loses a job but (1) fails to use best efforts to obtain a new one; (2) refuses to accept employment elsewhere; or (3) fails to show the unemployment is other than temporary. *Id.*

In determining a parent's potential income, the Form 14 permits a court to "consider employment potential and probable earnings level based on the parent's recent work history, occupational qualifications, [and] prevailing job opportunities in the community." *Holmes v. Holmes*, 878 S.W.2d 906, 909 (Mo.App. E.D.1994) (citing Form No. 14 "Directions for Completion of Form 14").

■■■■ The trial court found that "Mother is capable of earning $6,500 per month as an attorney." The evidence at trial indicated that Mother had, in the past, earned that amount and more working as an attorney for Mr. Williams in Missouri. She earned $8,583 per month in 2005, $7,583 per month in 2006, and $7,700 per month through October 2007. However, Mother also testified that as of October 2007, Mr. Williams no longer paid her a salary but rather $32 per hour for individual projects. While Mother at one time earned the amount that the trial court imputed to her, "[p]roof that a parent has previously made more money . . . is not alone a sufficient basis upon which to impute income at those levels." *Walker v. Walker*, 936 S.W.2d 244, 248 (Mo.App. S.D.1996); *Jones v. Jones*, 958 S.W.2d 607, 612 (Mo. App.W.D.1998); *Baker v. Baker*, 60 S.W.3d 19, 23 (Mo.App. E.D.2001).

Furthermore, there was no evidence that Mother voluntarily reduced her income. She testified that she had begun working sporadically on an as-needed, hourly basis for Mr. Williams because he could no longer afford her salary. Mother also stated that she had searched, unsuccessfully, for other jobs in the St. Louis area. Because Mother could not find other employment in Missouri and because Stepfather's position here offered no opportunities for advancement, Mother and Stepfather began to look elsewhere. Stepfather earned a position at the Raleigh, North Carolina Kinko's and Mother located a potential attorney position there. Because Mother experienced an involuntary reduction in her hours and wages, the evidence at trial did not support the court's conclusion that Mother is capable of earning $6,500 per month.

More importantly, Mother testified that she will move to North Carolina with Stepfather in the near future and that she has a potential employment opportunity with a personal injury attorney there. However,

Mother stated that she has not yet taken the North Carolina Bar exam and estimated at trial that she would earn $50,000 per year as unlicensed North Carolina attorney. In imputing income, the Form 14 requires a court to consider a parent's opportunities "in the community." *Holmes*, 878 S.W.2d at 909. The court did not consider the community in which Mother will work, and the fact that she may not be able to earn $6,500 per month as an unlicensed attorney in North Carolina.

While the trial court should not be bound by Mother's testimony that she will earn $50,000 per year in North Carolina, it also is not allowed to calculate her amount of income there based solely on speculation. *Monnig*, 53 S.W.3d at 247. We do not believe the record contains sufficient evidence from which to ascertain the proper income to be imputed to Mother, and therefore reverse and remand for further proceedings on that issue.

Mother also disagrees with the amount of income that the trial court imputed to Father. Mother argues that "[t]he amount of Father's income needs to be changed to reflect the amount he could earn and the amounts he received from inheritances and his family." The trial court found that Father had not been capable of making $3,678 per month since before the dissolution.[3] Instead, the court believed Father could earn $2,800 per month at his real estate job and imputed that amount to him.

Father testified at trial that he earned $1,400 per month working at Reconnect Realty but that he believed his income could increase to $2,000 per month very soon. In addition to his income at Reconnect, Father speculated that he earned an additional $3,000 or $4,000 every year from a company called "eRealty." Father also inherited $10,000 from his father, which he used to pay his child support arrearages in early 2007.

Again, it is not clear to this Court why the trial court imputed an income of $2,800 per month to Father. Since 2005, Father's monthly income has fluctuated between $1,200 and $2,300. Even if Father were to earn the anticipated $2,000 per month at his current job, plus $4,000 per year from eRealty, his monthly income would amount to $2,333. Contrary to Mother's assertions, no directions in Form 14's Comment section require a court to impute income to a parent due to an inheritance. *See* Directions, Comments for Use and Examples for Completion of Form No. 14. Furthermore, Father testified that he used the entire $10,000 inheritance to pay his child support arrearages. Father is not unemployed, and it does not appear from the record that he has intentionally reduced his income in order to evade his parenting responsibilities. Like the Form 14 computations for Mother's income, we reverse and remand this issue for further consideration.

Mother also claims the trial court erred in calculating the children's health care and child care costs. As to child care, the court found that Mother's work-related child care costs amounted to $125 per week or $542 per month. The court based its findings solely on Father's testimony because, when asked about daycare expenses, Father stated "I believe it's 125 a week." The record reveals, however, that Mother has always paid the child care costs. Mother argues that she pays $125 *per child*, per week, for child care and the business records of the daycare support her contention.

---

**3.** Though he was unemployed at the time, $3,678 is the amount the trial court imputed to Father in its Form 14 calculations for the 2005 dissolution.

The trial court also credited Mother $70 per month for health care costs for the children. This finding, again, is not supported by the evidence. Father testified that Mother carries health insurance for the children, but that he *could* insure them for $35 per child, per month, through Anthem Blue Cross. In Mother's brief she argues that Stepfather insures the children through his job and that it costs $191 per month. Mother presented evidence supporting this contention in the record on appeal and it appears that the trial court, again, based its finding on Father's potential health care costs rather than Mother's actual costs.

The record on appeal supports Mother's contentions regarding daycare and health insurance costs for the children. The record, however, also contains evidence that Mother and Stepfather have already relocated to North Carolina and that therefore these figures may no longer be correct or applicable. Regardless, the health care and daycare costs that the trial court entered into the Form 14 are not supported by the evidence. Thus, we reverse and remand for further proceedings on those issues.

■ In her third point on appeal, Mother argues that the trial court erred in awarding additional GAL fees because the fees were not supported by substantial evidence. We agree.

■ Section 452.423.5 RSMo Cum. Supp.2004 directs that the guardian ad litem shall be awarded reasonable fees as determined by the court. The court may issue a direct payment order to the parties or award the fees as a judgment to be paid by any party. Section 452.423.5(1), (2). We review such an award for an abuse of discretion. *McGowan v. McGowan*, 43 S.W.3d 857, 870 (Mo.App. E.D.2001).

The trial court's final judgment states that Ms. Colburn "incurred reasonable GAL fees in the amount of $3,920." The court issued a pre-trial direct payment order requiring Father and Mother to pay $600 each.[4] As to the remaining $2,820, in its final judgment the court ordered Mother to pay $1,974 (70%) and Father to pay $846 (30%).

■ It is incumbent on a guardian ad litem to show the extent of necessary services rendered for which the parties may be responsible. *In re Morrison*, 987 S.W.2d 475, 480 (Mo.App. S.D.1999). The requirement is designed to ensure both that the trial court's award is based on evidence and that the appellate court has a record to review in determining the propriety of the trial court's exercise of discretion. *Id.*

Ms. Colburn did not submit a bill with accompanying time records or any other evidentiary support regarding her time spent on this case. She merely testified to the number of hours she had billed and her rate per hour, then requested a judgment against the parties in that amount. Such a request, without any evidentiary support, is insufficient to sustain an award of GAL fees. *Morrison*, 987 S.W.2d at 480; *Reding v. Reding*, 836 S.W.2d 37, 41 (Mo.App. S.D.1992).

■ Mother also argues that the trial court abused its discretion in awarding the majority of GAL fees to her because the court actually appointed a guardian ad litem in order to investigate Mother's allegations of abuse and neglect on the children's behalf. "A trial court may, but is not required to, consider the circumstances that necessitated the appointment of the GAL when ordering the payment of GAL fees." *Clark v. Clark*, 101 S.W.3d 323, 331

---

4. Mother paid the amount in full and Father    paid $500.

(Mo.App. E.D.2003). The reason the trial court initially appointed a guardian ad litem does not appear in the record, and therefore we have insufficient evidence by which to review Mother's contention. Given the award's lack of evidentiary support, the judgment for GAL fees in the amount of $2,820 is reversed and remanded to the trial court for an evidentiary hearing to determine: (1) the appropriate amount of GAL fees; and (2) the manner in which these fees should be apportioned. Mother's point three is granted.

■ In her fourth point on appeal, Mother argues that the trial court erred in awarding Father attorney's fees on appeal. We agree.

■ The trial court has broad discretion to award attorney's fees. *Abbott v. Perez*, 140 S.W.3d 283, 296 (Mo.App. E.D. 2004). We presume the award is valid and reverse only for an abuse of discretion. *Id.*

A trial court may award attorney's fees pursuant to Section 452.355.1 RSMo 2000 after considering "all relevant factors including the financial resources of both parties, the merits of the case and the actions of the parties during the pendency of the action." *Groenings v. Groenings*, 277 S.W.3d 270, 279 (Mo.App. E.D.2008).

Eight months after the hearing on Mother's motion to relocate, the trial court held a brief hearing on Father's motion for attorney's fees on appeal. Father testified that his financial circumstances had not changed since the court granted his motion to prevent relocation, and stated that he anticipated incurring $15,000 of legal fees to defend Mother's appeal. Father asserted that Mother should pay for his legal fees on appeal because he does not want to appeal anything and because Mother, unlike he, has the ability to pay the fees.

In its findings of fact and conclusions of law, the trial court stated that Mother's appeal obligates Father to obtain appellate counsel in order to review Mother's brief, the trial transcript, relevant case law, and to file a respondent's brief. The court believed $15,000 to be a reasonable fee for Father's appellate counsel to perform those tasks. The court determined that Mother has the ability to earn significant income—$6,500 per month—and therefore should pay $15,000 for Father's legal fees because he cannot afford to do so.

■ We find that there was insufficient evidence on which to base the $15,000 attorney's fee award to Father. We recognize that "[o]ne spouse's greater ability to pay is sufficient to support an award of attorney's fees to the other spouse." *In re Marriage of Maninger*, 106 S.W.3d 4, 13 (Mo.App. E.D.2003). As we discussed above, however, the trial court's finding that Mother is capable of earning $6,500 per month is not supported by substantial evidence. Moreover, Mother did not attend the hearing on Father's motion for attorney's fees and Father could not even say for certain whether Mother was employed at that time. Thus, it is not clear from the record that Mother has a greater ability to pay Father's legal fees than he.

■ More importantly, Father presented no evidence of the necessary services or expenses of his appellate counsel other than to indicate that his counsel charges $225 per hour. "A party seeking attorney's fees on appeal must show the extent of the necessary services to be rendered by counsel, and the expenses related thereto, so that the trial court may make an award based on evidence of such services and expenses." *Groenings*, 277 S.W.3d at 280. Because he requested $15,000 in fees, Father apparently concluded that his appellate counsel would expend sixty-seven hours in handling his appeal.

While sixty hours might be a reasonable timeframe for handling an appeal, Father presented no evidence that such was required in this case.[5]  *Compare Russum v. Russum*, 214 S.W.3d 376, 388 (Mo.App. W.D.2007) (award of attorney's fees on appeal supported by substantial evidence where wife's attorney testified regarding services to be performed and expenses related thereto, and stated that a competent appeal required sixty hours).  The trial court's finding that Father would incur $15,000 in legal fees to defend Mother's appeal was based on speculation and not supported by substantial evidence.  Moreover, there was insufficient evidence that Mother had the greater ability to pay for Father's fees.  For the reasons stated above, the trial court abused its discretion in ordering Mother to pay $15,000 to Father for his attorney's fees on appeal.  Mother's fourth point is granted.

### III.  CONCLUSION

The judgment of the trial court is reversed and remanded.  The court's finding that relocation to North Carolina is not in the children's best interests is reversed.  The court's judgment granting Father a reduction in child support is reversed and remanded.  On remand, the trial court is directed to recalculate Mother's income based on her North Carolina residency and to reconsider Father's imputed income as well.  The court is further directed to examine relevant evidence concerning Mother's health care and child care costs and to recalculate those amounts as well.  The trial court's award of $2,820 in additional GAL fees is reversed and remanded with instructions to determine the appropriate amount of fees and the manner in which they should be apportioned.  Finally, the $15,000 attorney's fee award to Father is reversed.

KENNETH M. ROMINES, C.J., and GLENN A. NORTON, J., concur.

---

5.  We are further convinced that the $15,000 attorney's fee award was an abuse of discretion given that Father's counsel filed a short, poorly-drafted and scantily-researched appellate brief nearly one month out of time.