**Nataan B. SMITH, Appellant,**

v.

**Tracy Lee SMITH, Respondent.**

**No. WD 59247.**

Missouri Court of Appeals,
Western District.

March 26, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 30, 2002.

Application for Transfer Denied
June 25, 2002.

818

Mary Corinne Corley, Kansas City, for Appellant.

Kimberly Gale, Kansas City, for Respondent.

Before LISA WHITE HARDWICK, Presiding Judge, ROBERT G. ULRICH, Judge, and FOREST W. HANNA, Senior Judge.

PER CURIAM.

The father, Nataan Smith, appeals from the judgment, which changed the primary physical custody of the parties' minor daughter to the mother, Tracy Smith. There is no substantial evidence to support the trial court's judgment changing custody, or awarding guardian ad litem fees; therefore, the judgment of the trial court is reversed and the case is remanded for further proceedings in accordance with this opinion.

Nataan and Tracy Smith were divorced in Wyandotte County, Kansas, on August 19, 1992. The court awarded joint legal and physical custody of the party's one child, Jessica, born June 2, 1990. The primary physical custody was placed with the father. The mother was given specific weekend, weekday, and holiday visitation. Subsequently, but independently of each other, both parents moved to Missouri. On June 7, 1998, the father sent the mother a certified letter informing her that his employer, Southwestern Bell, had transferred him to Dallas, Texas, and that their daughter, Jessica, would be going with him. As a result, on June 29, 1998, the mother filed a motion with the Wyandotte County court and received an *ex parte* order prohibiting the father from taking Jessica to Texas until a hearing could be held. On July 3, 1998, the father filed his motion with the Wyandotte County court. The court issued its order permitting the father to take the child to Texas on a temporary basis. The father and Jessica moved to Dallas, Texas, where he was now employed. On July 20, 1998, the Wyandotte County court declined jurisdiction, stating no reason, but presumably because both parties had moved to Missouri after the Kansas divorce decree was entered.

On November 18, 1998, the mother filed a motion to modify custody in Jackson County, Missouri. She alleged that the father had denied her visitation and access to medical records, and that he had moved away without leaving a forwarding address. The father filed a cross-motion, which sought, among other matters, the court's permission to relocate the minor child to Texas.

On January 14, 2000, by agreement of counsel, the Jackson County Circuit Court entered orders permitting Jessica to stay with the father during the pendency of the action, and specifying certain dates of visitation for the mother. The mother was given visitation during the spring break at the mother's residence in Kansas City, and

on the last weekend of the months of February, March, and April to take place in Texas. Each party was ordered to pay the guardian ad litem $250.

At the time of trial, Jessica was ten years old, had lived with the father for nine years, and had lived with the father in Texas for over a year. The trial was held on August 16, 2000. The trial court changed custody by placing sole physical and legal custody with the mother, and granting the father specific visitation privileges. He was ordered to pay support, which is not in issue here.

The father raises five points on this appeal. Two of the points are directed at the court's failure to rule on the relocation issue. In the remaining points, the father argues that there was insufficient evidence to support the change of custody, the order for the payment of the guardian ad litem's fees and expenses, and the court's finding of contempt.

■ Our review is limited to the determination of whether the circuit court's judgment is supported by substantial evidence, whether it is against the weight of the evidence, or whether the circuit court erroneously declared or applied the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). In assessing the sufficiency of the evidence in a case modifying custody, the court of appeals will examine the evidence and its inferences in the light most favorable to the trial court's order, and defer to the trial court's assessment of the witnesses' credibility and accept the trial court's resolution of conflicting evidence, and presume that the trial court reviewed all of the evidence and based its decision on the child's best interest. Section 452.410.1; *In re McIntire*, 33 S.W.3d 565, 568 (Mo.App.2000). The court is presumed to act in the best interests of the child. *In re Interest of S.E.P.*, 35 S.W.3d 862, 867 (Mo.App.2001).

The father argues that the trial court applied the wrong standard because it considered the changed circumstances as "continuing" and made reference to the changed circumstances of the "parties." He maintains that the court should have considered whether there was a change in circumstances of the minor child or the custodial parent, as required by § 452.410.1 RSMo, and that the standard should have been "substantial or significant" not "continuing." The father also argues that the change of custody is not supported by substantial evidence.

■ A trial court should base its decision regarding a change of custody of a minor child on whether there has been a change in circumstances of the child or the custodial parent, § 452.410, RSMo, and whether the changes are "substantial" or "significant." *In re McIntire*, 33 S.W.3d at 569. Furthermore, the trial court must determine that the change of custody is in the best interest of the child. Section 452.410, RSMo.

■ The trial court need not find that the change in circumstances is "continuing." *In re McIntire*, 33 S.W.3d at 569. However, it does not follow that the trial court incorrectly applied the wrong standard simply because it found that the change in circumstances were continuing. In certain cases, a "continuing" change in circumstances may be an appropriate finding. In this case the court concluded the change was substantial. Point denied.

■ The father makes much of the fact that the trial court referred to "the parties" instead of the custodial parent. The father was one of the parties. Although the trial court's entry does not make the distinction, a review of the record satisfies us that the trial court applied the changed circumstances standards to the custodial

parent and child. Other than some incidental matters concerning the mother, the inquires of the parties and the court related to the father and the child.

At the conclusion of the evidence, the court requested proposed findings of fact and conclusions of law from both parties to be submitted by August 28. After requesting the findings and conclusions, the court immediately ordered a change of custody and directed, without delay, the physical transfer of Jessica to the mother. The court's two reasons for its order changing custody was the father's failure to cooperate with the guardian ad litem, and that he had failed to comply with the court's order regarding the payment of fees and costs.[1] We will not presume that the court was satisfied that the two reasons orally stated were sufficient to change custody. Following the court's oral order changing custody, the court was provided, as it requested, with the parties' proposed findings of fact and conclusions of law.

The court expanded on its findings and the basis for its ruling in its written entry entered August 28. The trial court's written entry recited the following in support of its determination that there was a change in circumstances.

1) The petitioner father has removed the minor child from the State of Missouri without consent of respondent mother or permission of the Court,

2) the petitioner father has willfully and wantonly denied visitation to respondent continuously and with total disregard of court orders,

3) petitioner father has violated the court's order by refusing to involve respondent in decisions regarding the health, education, and welfare of the minor child,

4) the petitioner has refused to provide the respondent or the Guardian Ad Litem with access to the child's medical records,

5) the petitioner has refused to cooperate with the child's court appointed Guardian Ad Litem,

6) the petitioner has refused to attend court ordered mediation.

We will address each of these findings in the order expressed by the trial court's written entry. A careful review of the record, viewed in a light most favorable to the court's decision, reveals that there is substantial evidence to support only points five and six.

 The trial court is presumed to have acted in the best interests of the child, and we defer to the trial court's assessment of what serves the child's best interests unless we are firmly convinced that the child's welfare requires some other disposition. *In re Interest of S.E.P.,* 35 S.W.3d at 867. In a child custody proceeding, we give greater deference to the trial court's determination than in any other type of case. *In re McIntire,* 33 S.W.3d at 568.

1. The petitioner father has removed the minor child from the state of Missouri without consent of respondent mother or permission of the court.

In the first point found by the trial court, the court determines that a basis for change of custody was the father's failure to obtain permission from the court before he relocated to Texas.[2] After receiving

---

**1.** Only the first reason, the failure to cooperate with the guardian ad litem, was mentioned in the court's written order.

**2.** This ruling was *not* on the relocation issue, but rather was a basis for the court's decision to change custody. The court did not rule the relocation issue.

the father's certified letter of notification of the pending relocation to Texas, the mother filed an *ex parte* motion in the Wyandotte County, Kansas, District Court seeking to prohibit the father from relocating to the state of Texas. On July 2, 1998, the father's attorney filed an "oral" application with the Wyandotte County District Court to allow him to take Jessica with him to Texas. The court granted the motion and entered a temporary order permitting the relocation. The father and child then moved to Texas. Subsequently, at the recessed hearing on July 20, attorneys for both parties appeared. At this hearing, without an explanation in its order, the court stated that it "declines jurisdiction of the subject matter." The father remained in Texas with the child. Shortly thereafter the mother filed her motion in the Jackson County Circuit Court requesting a change of custody. The father responded with his motion to relocate.

Because the Wyandotte County District Court declined jurisdiction after it originally granted permission to leave the state does not constitute a reason to change custody. The essential inquiry is the best interests of the child. *Puricelli v. Puricelli*, 969 S.W.2d 289, 296 (Mo.App.1998). The Missouri Supreme Court changed the previous four-factor test after this case was tried. On remand, the court will be guided by *Stowe v. Spence*, 41 S.W.3d 468 (Mo. banc 2001). The court stated that the 1998 amendments to § 452.377 adopted a two-pronged test, which now requires the court to determine whether the relocation is in the best interests of the child and whether it was made in good faith. *Id.* at 469. If ordered, it must comply with the requirements of subsection 10. *Id.*

The evidence on this point was largely ignored. The evidence does show that the father was employed by Southwestern Bell in Kansas City. His employer transferred him to Dallas, Texas. He informed the mother of the transfer by registered letter. Because she objected, he applied to the Wyandotte County, Kansas, District Court. The court granted him permission to relocate. He then took Jessica with him to Dallas, Texas. Subsequently, at a hearing with the Jackson County Circuit Court, a visitation schedule was presented and signed by the court. Included in that order was a provision allowing the father to remain in Texas pending the hearing on the relocation and change of custody motions that had been filed in Jackson County. These facts, albeit a minimum, satisfy the good faith requirement.

■ A residential change of the custodial parent to a distant location away from the non-custodial parent does not, by itself, establish that modification of the prior decree is appropriate. *Rice v. Shepard*, 877 S.W.2d 229, 231 (Mo.App.1994). Under the circumstances, the father's actions in leaving after the Wyandotte County District Court granted him permission was reasonable and did not constitute a basis for change of custody. In a technical sense, he did not have court permission some days after he was residing in Texas, because the court later declined jurisdiction. However, when he left this jurisdiction, he had a court order, secured with the assistance of his attorney, which granted him permission to relocate. That order was later recognized by the Jackson County Circuit Court's subsequent order of January 2000, permitting him to remain in Texas pending the hearing here. A change of custody should not be based on a legal error, for which the father is not necessarily accountable. There was no showing of bad faith on the part of the relocating parent. A change of custody is not supported by these facts. *In re McIntire*, 33 S.W.3d at 569.

The court did not rule on the relocation issue except as it may have been incidentally decided by its ruling on the change of custody issue. Because we are reversing the court's custody order, on remand the court may consider the good faith element more fully, and the second element concerning the child's best interests, as well as any additional evidence that may be appropriate to a relocation determination. *See Boling v. Dixon,* 29 S.W.3d 385 (Mo. App.2000).

2. The petitioner father has willfully and wantonly denied visitation to respondent continuously and with total disregard of court orders.

The court's "finding" does not make reference to any particular denial of visitation nor does it reference a certain court order. There are two court orders regarding visitation. The first order was entered in 1992 when the Wyandotte County District dissolved the marriage. The second order was issued by the Jackson County Circuit Court on January 11, 2000, when it was apparent that the 1992 visitation schedule was not practical. The January 11 order granted the mother visitation in Kansas City on January 10 and 11, 2000, during the child's spring break, and on the last weekends of February, March, and April of 2000.

 "The party awarded custody in the original dissolution decree is presumed to be a suitable custodial parent," with the burden of otherwise proving being placed on the party seeking modification. *Spire v. Adwell,* 36 S.W.3d 28, 31 (Mo.App.2000). The trial court must determine whether there is a change in circumstances of the minor child or the custodial parent. See, e.g., *Searcy v. Seedorff,* 8 S.W.3d 113 (Mo.

banc 1999). The change in circumstances must be substantial or significant. *In re McIntire,* 33 S.W.3d at 568–69. The court must also consider in those cases, where the child has been residing over the years with one parent, any disruption, which would result if the child were uprooted. *Baumgart v. Baumgart,* 944 S.W.2d 572, 577 (Mo.App.1997).

 Because we are uncertain of the basis for the court's finding, we review the several assertions made by the mother that the father denied visitation. Much of that testimony was directed at the Wyandotte County District Court visitation order entered in 1992, a visitation order obviously not intended for parents who lived over 500 miles apart.

The mother commenced her testimony that the 1992 visitation schedule provided for visitation on alternating weekends and every Wednesday evening and Saturday. She complained that she had not had any visitation with her daughter Wednesday evening, Saturday, or alternating weekends as ordered. However, she never testified that she attempted to see her daughter on any of these times, or that the father was responsible for her failure to visit with her daughter. She did not acknowledge the obvious, that the distance between the daughter's home in Dallas and her home in Kansas City was such that visitation on those occasions was not practical.[3] A court is not allowed to speculate as to the reasons she did not see her daughter on those days, and, specifically, the court cannot speculate that the father refused to allow her to visit with the child. It is a fair assumption that the visitation schedule was not complied with because of the distance involved between the mother and her child.

---

**3.** All of which attests to the importance of the 1998 amendments to § 452.377 requiring a visitation schedule with relocation cases.

Denial of visitation is a factor that can create a change in circumstances that may justify a modification of custody. *In re McIntire*, 33 S.W.3d at 570. The party seeking modification bears the burden of proving such a change in circumstances. *Spire*, 36 S.W.3d at 31. The burden of proof rested with the mother, and her vague and unclear testimony fell short of the necessary proof.

Well after the father and daughter moved to Texas, the parties, through their respective attorneys, presented the Jackson County Circuit Court with an order of visitation. It is apparent from the record that the court order was the result of the parties' agreement. The court order stated that the mother would have "overnight visitation with the child during the child's spring break, commencing no later than one (1) day following the beginning of the spring break. Said visitation to take place in Kansas City, Missouri. Petitioner shall be responsible for transportation from the State of Texas. Respondent shall be responsible for transportation back to the state of Texas." Further, the mother "shall have visitation with the child on the last weekend of every month during the months of February, March, and April, 2000 in Dallas, Texas." The mother was responsible for transportation costs. The court ordered certain medical examinations and in that regard ordered overnight visitation on Saturday night of the same week until 12:00 Sunday.

The evidence showed that there was good telephone communications between the mother, her daughters (Jessica's half sisters), and Jessica. Furthermore, there was visitation between the mother and Jessica, although not always to the mother's liking. Again, we discern from the evidence that the mother complained greatly about lost visitation, without further evidence as to the reason for her lost visitation, and particularly, whether the father was responsible. In fact, the evidence shows that the father was not responsible for much of the problem, except that he had been transferred to Texas.

A noteworthy point of contention was the mother's attempt to schedule a summer visitation in the year 2000. It was during the summer of 2000 when Jessica's grandmother fell ill and eventually died. As noted, the January court order of the Jackson County Circuit Court did not cover the 2000 summer visitation. However, it is apparent from the record that the attorneys worked out a visitation. Once arrangements had been made for the time and length of visitation and, in accordance with the agreement, the mother made airplane reservations for the flight from Dallas to Kansas City and return. Jessica and her father went to the Dallas airport where he picked up the tickets. He saw, for the first time, that the mother had extended the visitation twelve days past the agreed upon return date, which would have Jessica returning after the start of the school year. Having missed the start of school the year before, Jessica told her father that she did not want to miss the start of school and, therefore, did not want to go to Kansas City. Jessica relayed that message to her mother when she called.

The facts surrounding the 1999 summer visitation created a serious problem between the parents. The evidence was undisputed that the mother saw her daughter for an extended time during the summer of 1999. The best evidence, although unclear, was that the visitation period was about four weeks. At the end of that visitation, the mother sequestered the child to different locations instead of returning her to the father as agreed. Because of this, the father was compelled to come to Kansas City, retain counsel, and file a writ of habeas corpus. The mother

did not bring Jessica to court although the writ commanded her to do so. At the conclusion of the hearing, the court ordered Jessica returned to the father. The mother complied. The mother's actions caused Jessica to miss the start of her school year and a medical appointment that had been previously scheduled. This unfortunate incident, which occurred at the end of the summer of 1999, coupled with the change in the return date for the 2000 summer visitation agreement, played a significant role in disrupting the scheduled visit in 2000.

Notwithstanding that the January 2000 court order did not provide for summer vacation, or reasonable visitation, and the mother's actions in 1999 and 2000, some arrangements for visitation should have been accomplished. Although the father's failure to complete the summer visitation may be understandable, it is, nevertheless, unacceptable. He, as well as the mother, was responsible for making certain that the daughter had a period of visitation with the mother, irrespective of the acrimony between the parties and their attorneys. The parties and attorneys should have been able to reach a reasonable solution. Not having done so, the resolution called for some "fine tuning" of the custody arrangements. *Alt v. Alt*, 896 S.W.2d 519, 522 (Mo.App.1995). A sledgehammer was not necessary to correct the defect. *Id.* The evidence does not support the result reached.

The mother also complained about her visitation in February. Actually, on closer examination, it was determined that her complaints were not that she was denied visitation but rather that she was refused permission to visit the child in the father's home, and she thought that Friday should have been included as part of the "weekend." The evidence shows that she traveled to Texas and had a two-day visit with Jessica. The court order did not specify where the visitation was to take place, except that it was to be in Dallas, and it did not define the weekend as including Fridays. Again, this is a complaint of little consequence, which should have been easily resolved.

Next, the mother argues that she was denied other visitation as ordered by the January 2000 order. The record does not support that allegation. Rather, the evidence shows that the father substantially complied with this schedule. The child visited with the mother during her spring break, and the mother traveled to Texas for the February visitation. She concedes that she did not see her daughter in March or April because, as the mother testified, she was unable to travel to Texas due to other commitments.

The mother also argues that father brought Jessica to Kansas City for medical appointments without notifying the mother. Apparently things did not go as smoothly as the mother would have liked. The record reflects that the mother attended both medical appointments with the child, and she testified that she visited with the child after the medical appointments were completed.

A review of the record reveals that the father did not violate the January 2000 order of visitation. The mother's charges were, in fact, visitations that did not last as long as she wanted them, commenced at a later date than she expected them, or were complaints about a visitation schedule that was unworkable and subsequently modified by the Jackson County Circuit Court in January 2000. Her evidence was vague, unclear, and confusing as to time and occasion and often inconsequential, and insignificant. Her evidence was not sufficient to sustain the burden of proof for a change of custody. The trial court's finding that the father "willfully and wantonly denied

visitation to respondent continuously and with total disregard of court orders" is against the weight of the evidence.

3. Petitioner father has violated the court's order by refusing to involve respondent in decisions regarding the health, education, and welfare of the minor child.

The mother testified that, at the time of trial, the father had failed to inform her what school Jessica was enrolled in. She also testified that she asked the father for school records, but that he would not give them to her. However, she also testified that she went to the child's school and, eventually, she obtained the records. The father is not excused from his behavior, even though there is no evidence of harm to the mother or the child, except for the obvious inconvenience.

■■■ Both parties agreed that Jessica's most significant medical problem was diabetes. There was no evidence of any other medical problem. The mother agreed that the father contacted her the day after the diagnosis to inform her of the daughter's diagnosis. She also admitted that the father instructed her how to treat the child's diabetes. She complained that on one occasion the father did not send the proper supplies with the child during one of the visits to Kansas City. This testimony was shown to be untrue. There was no significant evidence that the father refused the mother's request for Jessica's medical records or access to those records.

There is no evidence in the record that the mother ever asked the father to provide her with medical records or access to medical records that was refused. The evidence shows that the father substantially complied with the terms and conditions of the January 2000 court order keeping the mother informed of the child's health, education, and welfare.

4. The petitioner has refused to provide the respondent or the guardian ad litem with access to the child's medical records.

There is simply no evidence before the court supporting this "finding" that the father refused to provide the guardian ad litem with any medical records.

■■■ 5. The petitioner has refused to cooperate with the child's court appointed guardian ad litem.

The guardian ad litem's testimony concerning the lack of the father's cooperation lacked specificity, and, significantly, it was directed to a like number of problems with the father's attorney. The guardian ad litem stated that she could not talk to or see her client, Jessica, for several months after her appointment. She had written several letters to the father's attorney and to the father and received no cooperation. Her phone calls to the father's attorney were unanswered. As a result of the uncooperative response from the father and his attorney, she took the father's deposition on June 11, 1999. She testified she was able to obtain all the information necessary to complete her investigation.

When questioned by the mother's attorney, the guardian ad litem testified that she had less cooperation with the father than with the mother, although she did not receive total cooperation from either parent. She testified with respect to the father, "I don't think he understood that my role was to be the attorney for his daughter nor did he understand what my role was as attorney for his daughter. I think he felt very defensive."

The father denied that he failed to cooperate with the guardian ad litem, but the trial court determines the credibility issue. Thus, the court resolved the conflicting testimony in favor of the guardian ad litem, thereby supporting this finding.

However, the father's refusal to cooperate with the guardian ad litem is not sufficient to constitute a change in circumstances and merit a change of custody, where the guardian ad litem had "all of the documentation and information necessary for her recommendation." Therefore, there is no resulting harm that would cause a change of custody.

One final observation is in order. It is a well settled principal regarding custody matters that custody is not to be used as a reward or punishment of either parent, but rather it must be based upon the best interests of the child. *Miers v. Miers*, 53 S.W.3d 592, 597 (Mo.App. 2001). The guardian ad litem's ill advised testimony left the impression that her recommendation was in the nature of punishing the father for his lack of cooperation. She testified, orally and in her written report, that custody be changed to the mother "due to the communication problems, until the father demonstrates he can cooperate." An award of custody based upon a failure to cooperate with the guardian may not be used to reward or punish a parent. *Petty v. Petty*, 760 S.W.2d 555, 557 (Mo.App.1988).

6. The petitioner has refused to attend court ordered mediation.

The court ordered mediation. The father did not attend. The guardian ad litem testified that she sent "probably 5 letters to the (father's attorney) about mediation," and explained its mandatory nature but could not "get any movement on it." The guardian ad litem did not tell the father about the mediation although she talked to him on several occasions. The mother testified that she was unwilling to attend mediation, explaining that she did not attend mediation because "they had told me that if the other party is not willing to attend mediation, then there couldn't be a mediation at that time. I let them know, well, whenever the other party is ready, I am ready to go to mediation." The father testified that he never received notice of the mediation. He testified that he did not know that mediation was a requirement, but he is bound by the evidence that the guardian ad litem provided that she notified his attorney. Although the court's finding is correct that he did not attend mediation after notice to his attorney, the finding is not a basis for a change of custody. There was no intentional or purposeful refusal to attend court ordered mediation upon which to base a change of custody decision.

It is clear from the evidence, and the briefs filed with the court, that the difficulties between the parties started after the father moved to Texas, and most, if not all of the problems, took place during the contentious modification proceeding. Although the mother continued to have numerous visits with Jessica after she moved to Texas, the situation was far from satisfactory. When scheduling Jessica's visitation with her mother, the father was an uncommunicative and reticent participant. He contributed to the mother's visitation problems. It is the conclusion of this court however, that the mother, who had the burden of proof, did not show a substantial or significant violation or that the best interests of the child were such to dictate a change of custody.

All of the evidence showed that the child made a smooth adjustment to life in Texas. She was doing well in school. Her last year's grades were 2 A's, 3 B's, and a C in technology. She was involved in girl scouts, skating, bowling and swimming, and had a home in an area where a number of her relatives lived. Dr. Jan Roosa, a local clinical psychologist, found the child to be "very articulate and appropriate," and the father's house to be "structured,

strict, quiet, [with] affection, .... a lot of reasoning and discussion." Roosa described Jessica as "a kid whose [sic] got a pretty good adjustment to life and does .... seem to fit with the environment that she is in, therefore, she should stay there." He testified that a change of custody would not be in the best interest of Jessica, and that "the important thing is that she maintain stabilization." Jessica had lived in Texas for two years before the change of custody was made. It is significant that Mr. Smith was a model father in every respect except as noted herein. On the other hand, the mother presented very little testimony as to the life Jessica would live in Missouri except that she would live with her half-siblings and the mother's boyfriend. There was some minimal evidence about the mother, her living conditions, and the environment Jessica would be living in, but none of it was encouraging for placement of the child with her.

 The change in circumstances "must be of a nature that the child will substantially benefit from the transfer and the welfare of the child requires it." *Reeves–Weible v. Reeves,* 995 S.W.2d 50, 57 (Mo.App.1999). The evidence does not support the proposition that a change of custody will benefit the child.

The father also argues that the award of the guardian ad litem's fee was unreasonable and that it was not supported by substantial evidence. We agree.

 The trial court granted the guardian ad litem fees in the amount of $14,729.50 and expenses of $688. Again, there is no evidence from which the court could enter a fee of $14,729.50 and expenses of $688. The fee and expenses are not supported by the evidence. *Murphy,* 536 S.W.2d at 32. The guardian ad litem's final bill for services was not prepared at the time of the trial, and, when asked, she said it would be ready in two days. The

guardian ad litem testified about various matters but not about her fees. It is presumed that she submitted her fee bill after the close of the evidence, presumably two days after the close of evidence. It cannot be stated with any certainty that the amount of the guardian ad litem's fee was reasonable on its face considering the guardian's fee bill was approximately five times the amount submitted by the mother's attorney for her services. The fact that the court is an expert in these matters does not relieve the guardian from presenting evidence of her time involved, her charges, and the amount of her bill for services. This court has condemned the lax manner of evidence presentation in marital proceedings. *See In re Marriage of Vanet,* 544 S.W.2d 236, 244 (Mo.App. 1976). The lack of any basis for the court's judgment makes it necessary to remand the case for determination of the guardian ad litem's fee, which will provide evidence for the court's evaluation and permit the opposing party to challenge the reasonableness and necessity through examination.

 The court found that in nine separate incidents the father willfully failed to obey the court's orders. However, some of the "findings" are not supported by an order of the court. With respect to all, the father complains that there is no evidence that he intentionally and contumaciously disobeyed the orders of the court.

 Civil contempt is a remedial action, coercive in nature, whose purpose is to enforce a remedy ordered in the previous adjudication of the parties. *McCubbin v. Taylor,* 5 S.W.3d 202, 210 (Mo.App.1999). The trial court made findings but did not enter a judgment of contempt. A civil contempt order is not a final judgment until the order is enforced.

*Bailey v. Amon,* 941 S.W.2d 657, 658 (Mo. App.1997). It is not an appealable issue.

The judgment of the trial court is reversed and the case is remanded for further evidence on the issues of the guardian ad litem's fee and the relocation issue.