S.I.E., b/n/f J.E., and J.E., individually, Appellants/Cross–Respondents,

v.

J.M., a/k/a J.M., Respondent/Cross–Appellant.

J.E., Appellant/Cross–Respondent,

v.

J.M., and R.M., b/n/f J.M., Respondents/Cross–Appellants.

Nos. 26620, 26636, 26777.

Missouri Court of Appeals, Southern District, Division Two.

June 28, 2006.

Motion for Rehearing or Transfer Denied July 19, 2006.

Richard D. Crites, Springfield, for appellant.

Gail L. Fredrick, Fredrick, Rogers & Vaughn, P.C., Springfield, for respondent.

Before GARRISON, J., BARNEY, J., and BATES, C.J.

PER CURIAM.

This is an appeal arising from a judgment of the trial court which both modified certain child custody provisions of a previously entered judgment of paternity regarding a minor child, R.E., and established the paternity and child custody of a minor child, S.E. J.E. ("Father") and J.M. ("Mother") are the parents of the two female minors, however, they were never married.[1] They bring their separate appeals.

Viewing the evidence in the light most favorable to the trial court's judgment, *Smith v. Smith,* 75 S.W.3d 815, 819 (Mo. App.2002), the record reveals that thirty-six days after R.E. was born, Mother moved with R.E. to South Carolina to get away from Father and, as Mother described it, the "unbearable" stress he was placing on her. Mother testified to R.E.'s various long term medical problems, including "tuberous sclerosis" and a seizure disorder. She stated that R.E. now attends New Covenant Academy, a private Christian school, and that Mother's friend, John Bradford ("Bradford"), pays for her tuition to attend the school.

As for visitation between R.E. and Father, Mother admitted that she had denied Father visitation with R.E. on several occasions; that the parties "had a lot of problems with visitation;" and that visitation were often "volatile." Mother related she always invited Father to attend R.E.'s extracurricular events, such as dance recitals and other performances, and that Father sometimes attended.

Regarding S.E., Mother testified that S.E. has always resided with her. Mother stated that although she invited Father to be present at S.E.'s birth, he was not there. Mother testified it was not until S.E. was almost two years old that Father would visit with her for any length of time. Prior to that, Father would only see S.E. when the parties met to exchange custody of R.E.

Mother related that prior to April 11, 2003, she did not allow Father to take S.E. on overnight visits because S.E. "didn't know [Father] that well, and she was very young ...;" accordingly, Mother denied Father permission to visit S.E. prior to that time.

Mother also testified she believed both S.E. and R.E. love Father, and that when the children return from visiting with him they seem to have had an enjoyable time. Mother also testified she takes the children to church on a regular basis and feels it is important for them to be involved in church activities. She went on to state that she spends all day at home with S.E. and is trying to prepare her to start kindergarten. Mother related she has been *cooperating with Father* so that he can have more visitation with both children, and that she has offered him additional

---

1. Father filed his petition for paternity as to R.E., born February 29, 1996, on September 22, 1997, and R.E.'s paternity was established by the trial court on March 16, 1999. A parenting plan was entered at that time which gave Mother and Father "joint custody" of R.E. and "primary" physical custody to Mother.

Thereafter, on August 30, 2001, Father filed his petition to establish paternity as to S.E., who was born December 2, 2000, and an interlocutory judgment establishing S.E.'s paternity was entered on May 28, 2004. During this period of time, several motions were filed by both parties in relation to custody and visitation with both children and, thus, the trial court consolidated R.E.'s ongoing case with S.E.'s paternity action.

The trial court's judgment is very cumbersome, difficult to understand, and consists of thirty-nine pages.

visitation, although he has rarely exercised it.

Mother was not employed at the time of trial in this matter; had not been employed on a regular basis since June of 1995. Mother admitted that she is capable of working. Although R.E. is now in school, Mother feels that it is important for her to stay at home with S.E. Mother also related that her only income is the child support she receives from Father for R.E., and that Father has not been ordered to pay child support for S.E. Mother stated her "friend," Bradford, pays the majority of her monthly bills; provides Christmas gifts for the children; paid for a two week vacation to South Carolina for her and the children; and pays for her car insurance and vehicle maintenance. However, she related she was merely borrowing money from him and intended to pay it back eventually. Additionally, she set out that her parents had helped her financially in the past; that another friend, Ronald Adelberg, paid for her and the children to recently vacation at Disney World in Orlando, Florida; that her friend, Bill Wilson, had given her large sums of money on occasion while they were dating; that her cousin had paid for her court ordered guardian ad litem fees; and that she had at one time filed bankruptcy. She also stated that during both the trip to Florida and the trip to South Carolina mentioned above, Mother allowed the men paying for the trip to spend the night with her and the children. Mother related she had received housing assistance from the Department of Housing and Urban Development; that she receives "[s]tate assistance;" and that she has the children enrolled in Medicaid.

Mother admitted visiting Father's work supervisors on two different occasions and reporting certain incidents regarding her personal relationship with Father, so that "if something happened, [she] would feel somewhat protected." Mother denied that she tried to have Father fired from his law enforcement position and maintained that she felt it was "important" Father's superior officers knew that she "was afraid of [Father]...." Mother admitted to interfering with Father's visitation on several occasions, and that, as a result, Father had to call law enforcement authorities in order to exercise his visitation.

Mother initially testified she had never placed a child abuse and neglect hotline call against Father, although she later admitted that she had done so.

Mother also stated she and Father only lived together for a period of about three weeks during their entire relationship. She also related that she had called the police to come to her home on East Verona Street on at least three occasions and to her home on West Camelot Street "several" times due to violent interactions with Father. Mother also related she filed numerous police reports in several counties about Father's behavior, although her intent was never to have him prosecuted. Mother was only able to produce two of the aforementioned police reports at trial. Also, Mother filed two *ex parte* orders of protection against Father, one of which was entered with Father's consent.

The record also shows that on May 10, 2001, Mother called the police regarding a phone call she received which she suspected was from Father. Mother informed the investigating officer that Father "was mentally unstable;" "thought he could talk to and control demons;" "wanted to be a woman;" and had self-diagnosed "himself as bipolar...." Mother testified repeatedly that she was "afraid" of Father; that she was "always intimidated by him;" and that Father was "troubled."

Father testified that he graduated from Columbia College in 1996, and that he is

currently employed with the Stone County Sheriff's Department as a deputy sheriff. Father related he supplied medical insurance for the children through his work.

Father testified that he filed a paternity action as to R.E. when she was less than a month old in an effort to prevent Mother from moving to South Carolina with the child. In his paternity action, Father requested that Mother retain custody of R.E., but that he be awarded ample visitation. A temporary parenting plan entered in conjunction with the paternity action required Mother to bring R.E. to Missouri for visitation, and Father was ordered to reimburse Mother for half of her travel expenses. Father also related that when Mother moved to South Carolina in April of 1996, Father was allowed no visitation with R.E. from April 1, 1996, through August 29, 1996. Father also stated Mother brought R.E. to visit on one occasion, but that he was supposed to enjoy visitation with R.E. for one week and Mother did not allow that to occur.

Shortly thereafter, Father moved to South Carolina "[b]ecause [he] wanted to be near [R.E.]." At that time, he and Mother "were getting along . . ." and Father stayed with Mother at her home for two weeks after his move to South Carolina. While the parties resided in South Carolina, Father was allowed to visit R.E. at Mother's home, but he was not allowed to visit R.E. alone. The parties both returned to Missouri in March of 1997, and resided with Father's parents for a period of time until the "friction" between them was too great and Mother moved out.

Father testified that he pays $225.00 per month in child support for R.E. and that he has always been current with his support payments.

Father related he was not present at S.E.'s birth because he was working that night and he "didn't want to be there."

He stated he voluntarily made five child support payments to Mother and that he told her he "would help raise [S.E.] and any kind of support that [he] could give her." He related he always got presents for the children to give to Mother on major holidays.

Father described R.E. as a "timid, very loving, gentle, kind . . ." child who is "a joy to be around." Father stated that he got along well with R.E. and that even when R.E. would get upset at the custody exchange, afterwards she would be fine. Father described S.E. as "fun, loving, gentle, kind" and stated that she is "great to be around." He classified his relationship with S.E. as "[g]reat" and stated that he never had any disciplinary problems with her or R.E. He feels that he has a "meaningful relationship" with both children.

Father also testified he had repeatedly asked Mother to have visitation with S.E., and that for the first two years of S.E.'s life Mother denied his request. He stated that he had asked to take both children for an hour on one occasion in the summer of 2002, but Mother denied his request. He stated that when Mother finally allowed him to take S.E., she was "[a]bsolutely fine" in his care. He related he owned his own home where the children had separate bedrooms, and he had recently purchased puppies for both children. Father stated that he had arranged for the children to have child care with a woman near his home and that there were many children in his neighborhood with whom they could play. Father also noted that if he received custody of the children he intended to cooperate fully with Mother and her family regarding visitation and other issues, including putting a phone in the children's room so they could more easily communicate with Mother and her family.

Father opined that Mother had an agenda "to keep the children away from [him]," and that she had tried to sabotage his relationship with the children for a long time. He testified that she often denied him visitation with both children and that he had contacted the police on several occasions in relation to his visitation. He stated there was one period in 2002 in which he was not allowed to see the children for two months, and on another occasion he was denied visitation for four months. As a result, Father filed a complaint with the Stone County Prosecuting Attorney. He also stated he was never allowed to have "reasonable phone contact ..." with either child; that Mother had only allowed him to spend one Father's Day with S.E. since the time of her birth; and that Mother often called him to demand that the children be brought home early from visitation.

Father also testified that contrary to Mother's allegations, he had never broken into her house; bugged her home; or stalked, harassed, or watched her. He also testified that none of Mother's allegations relating to his behavior were true, including the negative reports she supposedly made to various law enforcement authorities and to his supervisors at work. Father further related he was aware that Mother contended she had filed numerous police reports against him, but testified that he was only contacted by the police on one occasion relating to a complaint by Mother. Father also related he consented to one of the *ex parte* orders of protection in an effort to protect his career, although he was relieved from "road duty" and reassigned to the jail for a period of time as a result of the *ex parte* order. He felt that he and Mother had a communication problem and that they had a conflicted relationship. Father went on to state that he felt like he "always [had] to be on guard when it comes to [Mother]" and that he felt

Mother was "a liar" when it came to statements regarding him. He felt it was in the children's best interests that the trial court grant custody to him.

"Our review of a court-tried case involving matters of custody is governed by *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976)." *Baxley v. Jarred,* 91 S.W.3d 192, 196 (Mo.App.2002). "We will affirm the judgment so long as it is supported by substantial evidence, is not against the weight of the evidence, and does not erroneously declare or apply the law." Id. "We give greater deference to the trial court's decision in a child custody case than in other civil cases, and we presume that the trial court reviewed all the evidence and awarded custody in light of the best interest of the child." *State ex rel. State of Kansas Social and Rehab. Srvs. v. R.L.P.,* 157 S.W.3d 268, 276–77 (Mo.App. 2005).

As best we discern her first point on appeal, Mother asserts the trial court erred in modifying custody of R.E. Specifically, Mother maintains the trial court abused its discretion in changing the custody arrangement from "joint custody," with R.E. residing with Mother, to "sole legal custody and primary custody," with R.E. residing with Father. She also asserts the trial court erred in admitting testimony from Dr. Ann Beatty ("Dr.Beatty") relating to R.E.'s emotional condition because there was a lack of foundation for such testimony. Further, she avers there was insufficient evidence upon which to establish a substantial and continuing change of circumstances such that modification of custody was warranted; that the trial court erred in finding a change in custody was in R.E.'s best interests; that the judgment erroneously applied section 452.375.2; and that the trial court failed to

use section 452.410 "as the standard of review of existing judgments."[2]

Modifications of custody awards are governed by section 452.410.[3] "To modify an award of custody, the court must find 'upon the basis of facts that have arisen since the prior decree that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child.'" *Love v. Love,* 75 S.W.3d 747, 762 (Mo.App.2002) (quoting § 452.410.1). "Thus, the court's determination is two-fold. It must first find that a substantial change of circumstances has occurred and, once it does, it must then find that the best interests of the child would be served by modifying custody." *Id.*

The required finding of a change in circumstances must relate to the circumstances of the child or the custodial parent. *McCreary v. McCreary,* 954

S.W.2d 433, 439 (Mo.App.1997). "An evidentiary basis to support a finding of a change of circumstances must be demonstrated which gives the trial court jurisdiction to consider making a change of custody." *McCubbin v. Taylor,* 5 S.W.3d 202, 207 (Mo.App.1999).

We observe that in its judgment, under the heading "MODIFICATION OF JUDGMENT," the trial court found "substantial changes have occurred since the entry of the Judgment [Paternity] dated March 16, 1999, [relating to R.E.], which now require modification of the original Judgment." Having found a substantial change in circumstances, the trial court then "considered all relevant factors and determined custody and parenting responsibilities in accordance with the best interest of [R.E.] as required by R.S.Mo. [section] 452.375.2 . . . ."[4] As a result, the trial court modified custody of R.E. and found that "Joint Physical Custody with Sole Legal Custody to [Father] is appropriate at

---

2. All statutory references are to RSMo.2000 and all rule references are to Missouri Court Rules (2005).

3. Section 452.410.1 sets out, in pertinent part:

Except as provided in subsection 2 of this section, the court shall not modify a prior custody decree unless it has jurisdiction under the provisions of section 452.450 and it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that *a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child.*
(Emphasis added).

4. Section 452.375.2 states:
The court shall determine custody in accordance with the best interests of the child. The court shall consider all relevant factors including:
(1) The wishes of the child's parents as to custody and the proposed parenting plan submitted by both parties;

(2) The needs of the child for a frequent, continuing and meaningful relationship with both parents and the ability and willingness of parents to actively perform their functions as mother and father for the needs of the child;
(3) The interaction and interrelationship of the child with parents, siblings, and any other person who may significantly affect the child's best interests;
(4) Which parent is more likely to allow the child frequent, continuing and meaningful contact with the other parent;
(5) The child's adjustment to the child's home, school, and community;
(6) The mental and physical health of all individuals involved, including any history of abuse of any individuals involved . . . ;
(7) The intention of either parent to relocate the principal residence of the child; and
(8) The wishes of a child as to the child's custodian.

this time" and that the parenting plan attached to the judgment was "in the best interests of [R.E.]."

 It is our view that the trial court correctly found there had been a change in circumstances such that modification of the trial court's previous judgment was necessary. Since the time of the original judgment relating to R.E., the record shows the parties' relationship had deteriorated to such an extent they were no longer able to communicate with one another and there was little likelihood they could "raise, comfort, discipline, support and nurture . . ." R.E. together under the custody arrangement in place. "In the context of joint custody, a breakdown of parental communication and cooperation is sufficient, in and of itself, to constitute a change in circumstances affording the basis for modifying a prior decree." *Brown v. Brown*, 19 S.W.3d 717, 721 (Mo.App. 2000).

 Having found that Mother and Father "have, what is plainly described as a troublesome, contentious, hostile, and strained relationship devoid of trust," the trial court set out that Mother and Father are unable to "set aside their personal differences and animosities . . ." in order to "work together to raise [R.E.] in a nurturing stable environment;" that Mother's behavior since the time of the previous judgment "is consistent with a pattern of conduct discouraging or preventing [Father] from exercising his visitation rights with [R.E.];" that even after the guardian ad litem tried to facilitate visitation, Mother continued to deny Father visitation with R.E.; that Mother "denied [Father] . . . his . . . summer visitation with [R.E.]" in 2003, which the court found "particularly significant since it is fairly close in time to the trial in this case . . .;" that "[t]he parties are unable to effectively communicate or reach agreements about the children,

and there is a tremendous amount of hostility, animosity and distrust between them in relation to [R.E.];" and that Mother has continually attempted to minimize Father's involvement with R.E. The trial court also cited the guardian ad litem's statement that Father and Mother "are professionals at making each other miserable . . . these two individuals could give lessons on how not to get along with your . . . child's other parent."

Additionally, the trial court chronicled the numerous *ex parte* orders filed by Mother; noted over twenty situations in which Mother denied Father visitation with R.E.; and detailed the myriad times that law enforcement had to be involved in sorting out visitation disputes between the parties. As such, based on the foregoing, under section 452.410 there is substantial evidence supporting the trial court's determination that there has been a substantial change in circumstances since the entry of the paternity judgment relating to R.E. such that modification of custody is warranted. *See* § 452.410.

Having determined that a substantial change of circumstances has occurred, we next determine if the best interest of R.E. would be served by modifying custody. *See Love*, 75 S.W.3d at 762. In examining the best interest factors of section 452.375, the trial court found neither parties' parenting plans were in the best interest of R.E.; that Mother does not want Father "to perform the function of a father to [R.E.]," while Father is "willing to actively perform his function as a father to [R.E.], and has the ability to do so;" that Mother "has engaged in a pattern [of] behaviors of discouraging and denying [Father] visitation with [R.E.], and minimizing his involvement with [R.E.];" that Mother and R.E. "have developed a strong dependence upon each other that is not in the best interest of [R.E.];" that "[a]s evidenced by

her behaviors in relation to [R.E.] and [Father], Mother does not want [R.E.] to have a frequent, continuing or meaningful relationship with Father;" that R.E. has "adjusted well to [Father's] home and community . . .;" that Mother's allegations regarding physical violence by Father are "not supported by competent credible evidence . . .;" and that Mother "is very anxious about [R.E.] . . . is dependent upon [R.E.] . . . [and] engages in behaviors which cause or encourage [R.E.] to be anxious and fearful of [Father]."

The trial court also found that six of the eight statutory factors set out in section 452.375 "require[ ] that a sole legal custody and joint physical custody arrangement be ordered to accomplish the best interest of [R.E.], with [Father] being designated as the legal custodian. . . ." [5] There was substantial evidence to support the trial court's finding that modification of custody from Mother to Father was in R.E.'s best interest. See *State ex rel. State of Kansas Social and Rehab. Srvs.*, 157 S.W.3d at 276–77.

As best we discern, Mother also argues the trial court did not apply section 452.410 in the present matter because it failed to specifically cite that statute in its judgment. This Court disagrees.

As previously stated, section 452.410.1 requires a court find " 'a change has occurred in the circumstances of the child or his custodian. . . .' " *Erickson v. Blackburn*, 169 S.W.3d 69, 77 (Mo.App. 2005) (quoting § 452.410.1). "However, the court is not required to state specifically what circumstances have changed as long as the evidence is sufficient to support a finding that such a change has occurred." *Id.* Here, as stated above, the trial court found "substantial changes have occurred

since the entry of the Judgment . . ." relating to R.E. such that modification of the original judgment was required. This Court finds no requirement that the statutory section actually be referenced by number in the trial court's judgment.

Additionally, Mother appears to argue the trial court's recitation and consideration of the eight statutory factors set out in section 452.375 was in error. We again disagree.

In addition to requiring a court find "that a change has occurred in the circumstances of the child or his custodian . . .," section 452.410.1 requires a finding "that the modification is necessary to serve the best interests of the child." In making such a determination, "the court must consider the public policy set forth in [section] 452.375.4 and each of the eight factors listed in [section] 452.375.2." *Erickson,* 169 S.W.3d at 75. We find no error in the trial court's judgment on this basis.

Lastly under this point, Mother maintains, in pertinent part, that "the trial court erred and abused its discretion in admitting testimony of [Dr. Beatty], a psychologist . . . for the reason there was insufficient foundation established as to the basis for her opinions [because] her testimony was based on assumption, surmise and incompetent facts."

This portion of Mother's Point I was not preserved for appeal. Where testimony is challenged on the basis of insufficient foundation, the challenge is one of admissibility, and such challenges must be raised by a timely objection. *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 616 (Mo. banc 1995). To be preserved for appellate review such objections "must be specific, and the point raised on appeal must be based upon the

---

5. The trial court found the other two factors under section 452.375 did "not weigh in favor or against any particular custody arrangement."

same theory." *King v. City of Independence,* 64 S.W.3d 335, 341 (Mo.App.2002) (internal quotation omitted). Mother made no such objection at trial relating to an inadequate foundation for Dr. Beatty's testimony.[6] "We will not review the contention of inadequate foundation raised for the first time on appeal." *Id.* (internal quotation omitted). Mother's Point I is denied.

▮▮▮▮ In her second point relied on, Mother asserts the trial court abused its discretion in awarding Father sole legal custody of S.E. and joint physical custody to the parties, because, as Mother maintains, "there was insufficient substantial evidence to establish such was in the best interest of [S.E.], the judgment was against the weight of the evidence, erroneously applies the law, is manifestly erroneous, and is punitive as to [Mother]." [7]

As already stated in Point I above relating to R.E., the trial court found that Mother and Father "have, what is plainly described as a troublesome, contentious, hostile, and strained relationship devoid of trust," and, thus, awarded joint physical custody of S.E. to Mother and Father, with Father having sole legal custody.

In making its award, the trial court made numerous findings of fact, including, *inter alia,* that "the behavior of [Mother] is consistent with a pattern of conduct discouraging or preventing [Father] from exercising his visitation ..." rights; Father had no visitation with S.E. "from her birth on December 2, 2000, through April 11, 2003;" Father "asked for and was denied any visitation with [S.E.], until April 11, 2003, after the [g]uardian ad [l]item interceded to effectuate the same;" Mother "denied [Father] ... his ... summer visitation with [S.E.]" in 2003, which the court found "particularly significant since it is fairly close in time to the trial in this case ...;" Mother exhibited "a pattern of behavior whereby [she] denies and undermines frequent and meaningful contact and visitation between [Father] and [S.E.];" that Mother's testimony was "not credible;" and that Mother "is capable of earning substantial income through reasonable employment," but that "she has not been employed for almost 10 years...."

Further, the trial court considered the relevant statutory factors set out in section 452.375.2 relating to S.E.'s best interest. The trial court found that Mother "does not want [S.E.] to have a frequent, continuing, or meaningful relationship with [Father];" that Mother has "engaged in a pattern [of] behaviors of discouraging and denying [Father] visitation with [S.E.], and minimizing his involvement with [S.E.];" that while Mother "does not want [Father] to perform the function of a father to [S.E.]" Father "is willing to perform his function as a father to [S.E.], and he has

---

**6.** We note that Dr. Beatty's deposition was also admitted into evidence at trial without objection by Mother.

**7.** We observe that while Mother's point relied on raises only the issues stated above, in the argument portion of this point she "adopts and restates the argument set forth in Point I ..."—a point which related solely to R.E. Further, in her one-page argument under this point she not only appears to raise the issue of Dr. Beatty's testimony, but she also includes a great deal of argument relating to R.E., although R.E. is not mentioned in the point relied on under consideration. " 'Errors raised for the first time in the argument portion of the brief and that are not raised in the point relied on need not be considered by this [C]ourt.' " *Pearman v. Dep't of Social Srvs.,* 48 S.W.3d 54, 55 (Mo.App.2001) (quoting *Morgan Publ'ns, Inc. v. Squire Publrs., Inc.,* 26 S.W.3d 164, 177 n. 8 (Mo.App.2000)). Accordingly, we review only the trial court's decision relating to the custody of S.E. as raised in Mother's point relied on.

the ability to do so;" that the interaction and relationship between S.E. and both parents is good; that while S.E. is "well adjusted to [Mother's] home, and community," she has "adjusted well to [Father's] home and community as well;" and that "[a]lthough [Mother] alleged [Father] committed acts of domestic violence ... the allegations are not supported by competent credible evidence."

Different standards are applied in determining custody in an original proceeding than in a modification. In the former, the trial court is required to consider all relevant factors including eight specifically enumerated in [section] 452.375.2; to determine the custody arrangement that will best assure that both parents have frequent, continuing and meaningful contact with their children so long as it is in the best interests of the child pursuant to [section] 452.375.4; and if, as in this case, the parties have not agreed to a custodial arrangement to include a written finding in the judgment or order based on the public policy in [section] 452.375.4 and each of the eight factors listed in [section] 452.375.2 'detailing the specific relevant factors that made a particular arrangement in the best interest of the child.'

*State ex rel. State of Kansas Social and Rehab. Srvs.*, 157 S.W.3d at 273 (quoting § 452.375.6).

In the present matter, the record reveals Father is gainfully employed; owns his own home; is educated; stated repeatedly that he wished to cooperate with Mother over child custody issues in the future; was found to be credible by the trial court; expressed his desire to nurture S.E.'s relationship with Mother's side of the family; made adequate child care arrangements for S.E.; provided some vol-untary support for S.E.; and agreed to comply with all visitation schedules and orders of the trial court.

Mother, on the other hand, is unemployed and relies on various male companions for financial support; has repeatedly violated orders of the trial court; has repeatedly and without explanation denied Father visitation with S.E.; has been blatantly uncooperative and combative with Father; has attempted to interfere with Father's career in law enforcement; has been untruthful; has filed numerous baseless complaints with law enforcement authorities regarding Father; has not kept Father informed about the welfare of S.E.; and has simply made no attempt to allow Father to have a "frequent, continuing and meaningful relationship ..." with S.E.

We defer to the trial court on matters of witness credibility, and it is free to believe or disbelieve all or none of the parties' testimony. *See Pearson v. Pearson*, 22 S.W.3d 734, 736 (Mo.App.2000). When conflicting evidence exists, we defer to the trial court's assessment of the evidence. *Green v. Green*, 26 S.W.3d 325, 327 (Mo. App.2000). The trial court in the present matter specifically found Mother's testimony was "not credible." As such, based on our review of the record and the trial court's specific statutory findings, we find sufficient evidence to support the trial court's award of custody to Father. Mother's Point II is denied.

We next examine Mother's third point relied on. In this third point of trial court error, Mother maintains the trial court erred in ordering her to pay child support to Father, because the trial court's modification of custody as to R.E. and the trial court's award of custody as to S.E. was in error.[8] She asserts, as she did in Point I

---

**8.** As best we discern from Mother's brief, she does not challenge the trial court's judgment

as to a specific amount of $348.00 per month in child support which she was ordered to

above, that the trial court abused its discretion in allowing and relying upon expert testimony from Dr. Beatty relating to R.E.'s "emotional condition;" that there was insufficient evidence upon which to establish a change in circumstances to warrant modification of R.E.'s custody; that there was insufficient evidence to show a change of custody was in R.E.'s best interest; that the trial court erroneously applied section 452.375 and failed to apply section 452.410; and that there was an abuse of discretion in removing S.E. from Mother's "primary physical custody."

 We do not address the allegations under this point relied on. As already stated in Points I and II above, the trial court's modification of custody as to R.E. and the trial court's award of custody as to S.E. were supported by substantial evidence. Further, it has long been held that "[t]he trial court has considerable discretion in matters of child support...." *Foraker v. Foraker*, 133 S.W.3d 84, 94 (Mo.App.2004). Lastly, Mother has included no argument or citation of case law relating to the issues specifically raised under this point relied on. Instead, she has merely stated that she "by reference restates, the argument portion of the brief set forth in Point I and Point II" without further discussion of the child support issue she raises in this point. "A point of error unsupported by a citation of a relevant authority is deemed abandoned under Rule 84.04(d)." *In re A.H.*, 963 S.W.2d 374, 379 (Mo.App.1998), *overruled on other grounds by State ex rel. Stubblefield v.*

*Bader*, 66 S.W.3d 741, 743 (Mo.2002). "When matters claimed as alleged error in a point relied on are not developed in the argument portion of a brief, they are deemed abandoned." *Id.* It has long been held that non-compliance with Rule 84.04 preserves nothing for appellate review. *Coyne v. Coyne*, 17 S.W.3d 904, 906 (Mo. App.2000). However, in cases involving the welfare of children, this Court is typically " 'more tolerant regarding [the] technical requirements of Rule 84.04 when the questions presented relate to the welfare of children ...' " as long as " 'the argument is sufficient in conjunction with the points relied on to ascertain the issues being raised.' " *Stangeland v. Stangeland*, 33 S.W.3d 696, 703 (Mo.App.2000) (citations omitted). Unfortunately, Mother makes no argument at all under this point relied on and her point is abandoned. Mother's Point III is denied.

We now turn to Father's sole point on appeal. He asserts the trial court abused its discretion in ordering the entire amount of the guardian ad litem fees be paid by him. Father argues that he and Mother stipulated on April 11, 2003, that "each party to the action was to pay into court the sum of $2,500.00 for guardian ad litem fees, and the trial court did not effectuate nor enforce that stipulation and order...." He goes on to assert that there was insubstantial evidence upon which the trial court could base its award of all fees to Father.[9]

In its judgment the trial court found that

pay; rather she limits her challenge to the fact that she was required to pay *any* child support at all. In its judgment, the trial court imputed income to Mother at $6.00 per hour for an average monthly gross income of $1,032.00.

9. We note that the legal file does contain an undated "Memorandum For Clerk" signed by the parties and the trial court which includes the notation: "[p]arties are to post [guardian

ad litem] fees to the registry of the court in the amount of $2,500 each;" however, there is nothing before this Court relating to a stipulation by the parties to *split* the costs of the guardian ad litem fees, as Father contends. Rule 81.12(a) requires an appellant to file a record on appeal which "shall contain all of the record, proceedings and evidence necessary to the determination of all questions to be presented...."

[t]he Guardian Ad Litem has been paid in full for his expenses and services incurred in representing the minor children in the amount of $8,350.00. These fees and expenses have been paid by [Father] at the Order and direction of the Court in light of [Mother's] inability to pay her proportionate share. The Court hereby allocates these fees and expenses to [Father].

A trial court may appoint a guardian ad litem in cases where custody, visitation, or support of a child is at issue. § 452.423.1. Section 452.423.5 provides that "[t]he guardian ad litem shall be awarded a reasonable fee for such services to be set by the court. The court, in its discretion, may: ... [a]ward such fees as a judgment to be paid by any party to the proceedings...." "The duty of the court to appoint a guardian ad litem necessarily implies the obligation to pay the guardian ad litem and the power of the court to fix reasonable compensation." *Anselmo v. Guasto*, 13 S.W.3d 650, 654 (Mo.App.1999). "A circuit court may consider the circumstances surrounding the appointment of a guardian ad litem in determining payment of fees." *Stirling v. Maxwell*, 45 S.W.3d 914, 916 (Mo.App.2001) (emphasis omitted). A reviewing court should not disturb the trial court's award of guardian ad litem fees absent an abuse of discretion. *McGowan v. McGowan*, 43 S.W.3d 857, 870 (Mo.App.2001). "An abuse of discretion is committed if the trial court's decision defies logic under the circumstances, is sufficiently arbitrary and unreasonable to shock the conscience of the court, and exhibits a dearth of careful consideration." *In Re K.L. W.*, 131 S.W.3d 400, 404 (Mo. App.2004) (quoting *Betts–Lucas v. Hartmann*, 87 S.W.3d 310, 328 (Mo.App.2002)). Regardless of any agreement the parties may have had, "[i]t is within the trial court's discretion to determine against whom the judgment may be rendered" and for what amount. *Anselmo*, 13 S.W.3d at 654.

Here, the trial court found that Mother had violated orders of the trial court; had been blatantly uncooperative and combative with Father; had been untruthful; and had attempted to keep Father from engaging in a frequent, continuing and meaningful relationship with S.E. and R.E.[10] Given these circumstances, it is our view that the trial court abused its discretion in assessing all guardian ad litem fees to Father. Father's Point I is well taken.

Accordingly, we exercise our prerogative under Rule 84.14 and modify the judgment to provide that the parties shall share equally the costs of all guardian ad litem fees; in all other respects the judgment of the trial court is affirmed.

10. Additionally, the trial court noted in its judgment, *inter alia*, that it "specifically f[ound] a pattern of behavior whereby [Mother] denies and undermines frequent and meaningful contact and visitation between [Father] and one or both of his children." Additionally, the court set out that

[Mother] either testified to, or there was evidence presented at trial of her reporting to others over the past few years, about several incidents where [Father] was physically abusive, threatened to kill her, threatened to kill [R.E.], threatened to kill a member of her family, threatened to commit suicide, threatened to take [R.E.] out of the State, engaged in bizarre sexual behaviors, stalked her, harassed her, broke into her home, and committed trespass upon her property. [Father] denied these allegations. The Court, after carefully considering the evidence presented at trial and observing the parties demeanor throughout the trial, and particularly while giving their own testimonies, finds the evidence that [Father] committed these acts or engaged in these behaviors is not credible.